**Phillip E. BEARD, Trustee for Greater Pittsburgh Business Development Corp.**

v.

**Melvin A. BRAUNSTEIN, an individual, d/b/a M.A. Braunstein Co., Appellant.**

No. 90–3100.

United States Court of Appeals, Third Circuit.

Argued Aug. 14, 1990.
Decided Sept. 21, 1990.

David Abrams (argued), Abrams & Mazer, Monroeville, Pa., for appellant.

Paul R. Rennie (argued), Stonecipher, Cunningham, Beard and Schmitt, Pittsburgh, Pa., for appellee.

Before MANSMANN, GREENBERG and SEITZ, Circuit Judges.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

Philip E. Beard, trustee in bankruptcy of the Greater Pittsburgh Business Development Corp., brought an adversary proceeding in the Bankruptcy Court for the Western District of Pennsylvania against Melvin A. Braunstein. Greater Pittsburgh had filed a Chapter 7 bankruptcy petition on January 14, 1985, and Beard was its trustee. Beard styled his complaint as one "to Recover Money of the Estate and for Declaratory Judgment." The object of the action was to recover rents from Braunstein for the use of two buildings in Braddock, Pennsylvania, owned by Greater Pittsburgh, and to obtain a declaratory judgment that an alleged option held by Braunstein to buy one of the buildings was invalid. Jurisdiction was pleaded under 28 U.S.C. § 1334(b) and Beard asserted that the action was a core proceeding under 28 U.S.C. § 157(b). Before answering, Braunstein moved to dismiss the action on the ground that the case was not a core proceeding and the bankruptcy court did not have jurisdiction, but this motion was denied by the bankruptcy court by an order entered February 24, 1986. In the order denying the motion to dismiss, the bankruptcy court, pursuant to 28 U.S.C. § 157(b), determined that the action was a core proceeding. Braunstein then answered and, though he had not filed a proof of claim, counterclaimed, denying liability, requesting a dismissal of the action, and seeking damages allegedly caused by the poor condition of one of the buildings. In his answer and counterclaim, Braunstein asked for a trial by jury. During discovery, the bankruptcy court imposed a $420 sanction on Braunstein on account of his insufficient answers to interrogatories.

While the matter was pending in the bankruptcy court Beard filed an amended complaint, following which Braunstein again moved to dismiss the action for lack of jurisdiction, a motion predicated on his contention that this was not a core proceeding under 28 U.S.C. § 157(b)(2). Alternatively Braunstein requested, pursuant to 28 U.S.C. § 1334(c)(2), that the court abstain from hearing the case. This motion was denied in both aspects. The case was ultimately tried in the bankruptcy court without a jury and an opinion and order favorable to Beard on the merits were entered on April 20, 1987. Braunstein then appealed to the district court which, by a memorandum and order of January 25, 1990, in all respects affirmed the bankruptcy court. Braunstein then appealed to this court.

Braunstein asserts that he was improperly denied a jury trial as guaranteed by the Seventh Amendment. We agree and thus

we will vacate the order in favor of Beard on the merits of the case. Braunstein also complains that he was denied due process in the proceedings resulting in the sanctions but we will affirm on this point.[1]

## FACTS

The germane facts are not complicated. Prior to filing the bankruptcy petition, Greater Pittsburgh leased portions of the two buildings involved, the Brandywine building and the Beer Distributor building to Braunstein. The first Brandywine lease was for six years, was dated March 1, 1982, and covered 7,300 square feet at a rent of $730 per month. The second Brandywine lease was for three years, was dated April 1, 1982, and covered 5,000 additional square feet at a rent of $375 per month. The second lease included an option by which Braunstein could extend it at an increased rent. In his complaint, Beard claimed that Braunstein had failed to pay rent for the Brandywine leaseholds for October 1982, October 1984, November, 1984, and October 1985, and had failed to pay the increased rent due after the expiration of the three-year lease. Beard also asserted that Braunstein was liable for rent for space that he had been occupying in the building but that had not been leased to him. Subsequently, Beard amended his contentions to assert that the rent for the Brandywine building had not been paid through January 1986, when the building was sold to another person. In his answer and counterclaim, Braunstein claimed certain set-offs, mostly on account of the allegedly poor condition of the premises.

The Beer Distributor lease was for two years, was dated January 4, 1983, and covered 12,000 square feet at a rent of $1,250 per month. Beard alleged that Braunstein continued to occupy the Beer Distributor building after the expiration of the lease on a month-to-month basis, but had failed to make rental payments since October 1984. Beard also alleged that Braunstein had an option to purchase the building but that the option was invalid. In his answer and counterclaim, Braunstein responded that he had exercised the option on November 16, 1984, and that he had ceased to pay rent because of the condition of the premises.

The bankruptcy court conducted a bench trial and reserved decision. In an opinion of April 20, 1987, the bankruptcy court found that the rent had not been paid; that Braunstein was entitled to set-offs for services he had performed, though not by reason of the condition of the premises; and that Braunstein was liable for additional rent for occupying more space than the leases provided in the Brandywine building. Furthermore, though Braunstein was no longer seeking to purchase the Beer Distributor building, the court found his option invalid. In its opinion, the bankruptcy court adhered to its earlier finding that this was a core proceeding, but stated that if it was not, its conclusions were its recommended findings of fact. On April 28, 1987, Braunstein appealed to the district court.

On January 25, 1990, the district court issued its opinion determining that the case was a core proceeding within 28 U.S.C. § 157(b)(1) and, on the merits, finding no errors. Thus, by order of January 25, 1990, it affirmed the orders of the bankruptcy court from which Braunstein had

---

1. The bankruptcy court had jurisdiction under 28 U.S.C. § 157, in that this proceeding is at least "related to a case under Chapter 11," in that recovery by Beard would augment the estate. *See Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984) (proceeding is related to bankruptcy if the outcome could conceivably have an effect on the bankruptcy estate); *Quattrone Accountants, Inc. v. I.R.S.*, 895 F.2d 921 (3d Cir.1990). The district court had jurisdiction under 28 U.S.C. § 158(a), and we have jurisdiction under 28 U.S.C. § 158(d). Inasmuch as the facts significant to our disposition are not in dispute, we are deciding the matter on a legal basis and are exercising plenary review, except with respect to the sanctions issue.

Braunstein moved to dismiss the proceedings in the bankruptcy court on the grounds that Beard had failed to join an indispensable party, the First Federal Savings and Loan Association, a mortgagee which had sought to collect rents on one of the buildings. This motion was denied and the issue has been preserved and raised on this appeal but, as we find it clearly without merit, we do not discuss it. Braunstein makes an extensive argument regarding the merits of the case but it is obviously moot.

appealed. On February 19, 1990, Braunstein appealed to this court.

## DISCUSSION

■ The principal issue on this appeal involves Braunstein's claim that he had a right to a jury trial. Beard responds that *"[o]nce it is concluded that a matter is a core proceeding, automatically there is no right to a jury trial."* Brief at 25 (emphasis in original). Beard's position, however, is not reconcilable with the Supreme Court's recent decision in *Granfinanciera S.A. v. Nordberg,* —— U.S. ——, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), in which it held that, under the Seventh Amendment,

> a person who has not submitted a claim against a bankruptcy estate has a right to a jury trial when sued by the trustee in bankruptcy to recover an allegedly fraudulent monetary transfer ... notwithstanding Congress' designation of fraudulent conveyance actions as 'core proceedings' in 28 U.S.C. § 157(b)(2)(H).

109 S.Ct. at 2787.

■ Thus, we are required to engage in a deeper analysis than proposed by Beard of the requirements of the Seventh Amendment, which provides:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.

In *Parsons v. Bedford,* 28 U.S. (3 Pet.) 266, 7 L.Ed. 732 (1830), the Supreme Court explained that:

> The phrase 'common law,' found in this clause, is used in contradistinction to equity, and admiralty, and maritime jurisprudence.... By common law [the framers meant] not merely suits, which the common law recognized among its old and settled proceedings, but suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and where equitable reme-

dies were administered; or where, as in admiralty, a mixture of public law, and of maritime law and equity was often found in the same suit.

*Id.* at 274–75.

More recently, the Supreme Court has explained that:

> Although 'the thrust of the Amendment was to preserve the right to jury trial as it existed in 1791,' the Seventh Amendment also applies to actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty.

*Granfinanciera,* 109 S.Ct. at 2790.

Beard styled his action as one to "recover money [*i.e.* property] of the estate," thus attempting to characterize it as a statutory action under 11 U.S.C. § 542(b) ("... an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on order of, the trustee ...").[2]

*Granfinanciera* prescribes a three-part analysis to determine whether there is a right to a jury trial in a statutory action.

> 'First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature.' The second stage of this analysis is more important than the first. If on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment, we must decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as a factfinder.

109 S.Ct. at 2790 (citations omitted).

### I. The nature of the claims

Thus, we first determine how the issues raised by Beard's complaint relate to late

---

**2.** It may be overly generous to Beard even to make a statutory analysis, as the rent claims could have been asserted at common law independently of any statute.

438

18th century actions in the courts of England. Beard's complaint included a claim for rent based on the leases, including the period in which Braunstein held over; a claim for additional rent based on Braunstein's occupancy of additional space; and a claim for a declaratory judgment that Braunstein's option on the Beer Distributor building was invalid. The claim regarding the option on the Beer Distributor building is moot, as the building has been sold to another person and by the time of the trial Braunstein was no longer seeking to acquire that building. Accordingly we will not discuss the option further.[3]

■ An action for rent sounds in contract. "In every lease for years, there is a contract between lessor and lessee." *Walker's Case*, 76 Eng.Rep. 676, 679, 3 Coke's Rep. *22a, *22b (K.B. 1587); *see also* W. Holdsworth, A History of English Law 272 (1927) (rent is a contractual obligation to pay for the use of the land). Beard advanced both an action in express contract for the unpaid rent for the leaseholds, and an action in trespass for the overuse. The remedy for the breach of an express contract at common law was either an action of debt, *see* 3 W. Blackstone, Commentaries on the Laws of England (1898 Edition) at *154, or more likely an *indebitatus assumpsit.*[4] *See id.* at *155– 56. The trial of such actions in 1791 would have undoubtedly been by jury:

> I may declare that the defendant, *being indebted* to me in 30£, *undertook* or promised to pay it, but failed; and lay my damages arising from such failure at what sum I please: and the *jury* will, according to the nature of my proof, allow me either the whole in damages, or any inferior sum.

*See id.* at *156 (emphasis added).

The overuse would have lead either to an implied *assumpsit, see id.* at *162–63, or trespass *quare clausum querentis fregit.*[5] *See id.* at *209–11. Both of these actions

were triable to a jury in 1791. *See id.* at *163, *214.

In the English law courts in the late 18th century, the fact that an assignee in bankruptcy was plaintiff did not preclude the use of a jury. In *Keay v. Rigg*, 126 Eng. Rep. 749, 1 Bos. & Pul. 11 (C.P. 1797), the assignee of the bankrupt sued in contract for work done by the bankrupt, and the cause was tried by a jury. Indeed, the court concluded that even though a question of bankruptcy was involved, the action could have been tried in the local court, due to the small amount involved.

## II. The nature of the remedy

The second, "more important" part of the inquiry directed by *Granfinanciera,* is the nature of the remedy. The remedy sought in this case, a money judgment, is clearly legal. *See, e.g., Granfinanciera,* 109 S.Ct. at 2793; *Pernell v. Southall Realty,* 416 U.S. 363, 370, 94 S.Ct. at 1723, 1727, 40 L.Ed.2d 198 (1974); *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 477, 82 S.Ct. 894, 899, 8 L.Ed.2d 44 (1962) ("insofar as the complaint requests a money judgment it presents a claim which is unquestionably legal"); *Whitehead v. Shattuck,* 138 U.S. 146, 152, 11 S.Ct. 276, 277, 34 L.Ed. 873 (1891) ("where an action is simply for ... the recovery of a money judgment, the action is one at law."). Hence, a complete remedy is available at law, and equity will not allow an action in such a case. *See, e.g., Schoenthal v. Irving Trust,* 287 U.S. 92, 95, 53 S.Ct. 50, 51–52, 77 L.Ed. 185 (1932).

Since Beard's action "plainly [sought] relief traditionally provided by law courts or on the law side of courts having both legal and equitable dockets," we must now determine if Congress has "permissibly withdrawn jurisdiction over that action by courts of law and assigned it exclusively to non-Article III tribunals sitting without juries." *Granfinanciera,* 109 S.Ct. at 2794.

---

3. Even if the declaratory judgment claim were characterized as equitable, a determination we do not make, it could not affect our analysis. *See, e.g., Ross v. Bernhard,* 396 U.S. 531, 537–38, 90 S.Ct. 733, 738, 24 L.Ed.2d 729 (1970).

4. "Being indebted, he undertook."

5. "Wherefore he broke his close."

III. May Congress assign this claim to a non-Article III adjudicative body that does not use a jury as a factfinder?

In *Atlas Roofing Co., Inc. v. OSHRC*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977), the Court dealt with Seventh Amendment challenges to provisions in the Occupational Safety and Health Act, allowing for administrative civil penalties for violations of health and safety standards, subject first to administrative review and then to judicial review in the appropriate court of appeals under a substantial evidence test. 29 U.S.C. § 660(a),(b). The challenge was that the Seventh Amendment prevented the assignment of the factfinding functions in the Act to the administrative agency.

The *Atlas* Court indicated, however, that when Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be 'preserved' in 'suits at common law.' ... This is the case even if the Seventh Amendment would have required a jury where the adjudication is assigned instead to a federal court of law instead of an administrative agency.[6]

430 U.S. at 455, 97 S.Ct. at 1269.

With regard to the objection that if the right to a jury trial depends on the forum which Congress has chosen, Congress could utterly destroy the right by always providing for administrative resolution, the Court answered:

> Our prior cases support administrative factfinding in only those situations involving 'public rights,' *e.g.*, where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable private rights. *Wholly private tort, contract, and property cases*, as well as a vast range of other cases as well are not at all implicated.

430 U.S. at 458, 97 S.Ct. at 1270 (emphasis supplied).[7]

*Granfinanciera* stated that:

> We adhere to that general teaching.... [Although] Congress may devise *novel* causes of action involving public rights free from the strictures of the Seventh Amendment if it assigns their adjudication to tribunals without statutory authority to employ juries as factfinders,[8] ... it lacks the power to strip parties contesting matters of private right of their constitutional right to a jury.... '[L]egal claims are not magically converted into equitable issues by their presentation to a court of equity,' *Ross v. Bernhard*, 396 U.S. 531, 538, 90 S.Ct. 733, 738 [24 L.Ed.2d 729] (1970),[9] nor can Con-

---

**6.** *See Tull v. United States*, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987) (In an action for a statutory penalty brought in federal district court, a defendant is entitled to jury trial on the issue of liability though not on the amount of the penalty.)

**7.** It was also noted that, even in suits involving private rights, the right to a jury trial turned on whether courts of law supplied a cause of action and an adequate remedy to the litigant. If it did, then the case would be tried in a court of law before a jury. Otherwise the case would be tried to a court of equity sitting without a jury. Thus, *suits for damages for breach of contract, for example, were suits at common law with the issues of the making of the contract and its breach to be decided by a jury;* but specific performance was a remedy unavailable in a court of law and where such relief was sought the case would be tried in a court of equity with the facts as to making and breach to be ascertained by the court.

430 U.S. at 458–59, 97 S.Ct. at 1271 (emphasis supplied).
Of course, Beard sued for damages for breach of contract.

**8.** The rule is different if it employs "the ordinary courts of law." *See Curtis v. Loether*, 415 U.S. 189, 194, 94 S.Ct. 1005, 1008, 39 L.Ed.2d 260 (1974).

**9.** *Ross* involved a stockholders' derivative suit, historically an equitable action. The case, however, included issues which, if brought in an action by the corporation itself, could have been tried to a jury. The court of appeals had held that the entire action was equitable, and no jury was required to try any part of it. The Supreme Court reversed, holding that "[t]he Seventh Amendment question depends on the nature of the issue to be tried rather than the character of the overall action." 396 U.S. at 538, 90 S.Ct. at 738. Accordingly, as to those issues which are legal in nature, the right to trial by jury is preserved.

gress conjure away the Seventh Amendment by mandating that traditional legal claims be brought there or taken to an administrative tribunal.

109 S.Ct. at 2795–96 (emphasis added). *Granfinanciera* concluded that "[u]nless a legal cause of action involves 'public rights,' Congress may not deprive parties litigating over that right of the Seventh Amendment's guarantee to a jury trial." *Id.* at 2796.

What are public rights? A comparatively limited view was advanced in *Atlas* and in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 69, 102 S.Ct. 2858, 2870, 73 L.Ed.2d 598 (1982) ("a matter of public rights must at a minimum arise 'between the government and others' ") (plurality). However, in *Thomas v. Union Carbide Agr. Products Co.*, 473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), the Court expanded the public rights doctrine to the extent that:

> Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, may create a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary.

*Id.* at 593–94, 105 S.Ct. at 3339–40.

This holding, however, should not be read too expansively for the right in *Thomas*, while "seemingly private," bore "many of the characteristics of a 'public' right." *Id.* at 589, 105 S.Ct. at 3337. *Thomas* dealt with the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136 *et seq.* As a precondition for registration of a pesticide, manufacturers must submit research data to the Environmental Protection Agency concerning the product's health, safety and environmental effects. To increase efficiency and competition, Congress provided that data submitted by one registrant could be considered in support of future registrants even though much of this data could be considered trade secrets. Congress ultimately established what was, in effect, a mandatory data-licensing scheme, providing that new registrants must offer to compensate the data submitter, and for binding arbitration in the event the two could not agree on a price. *Id.* at 571–75, 105 S.Ct. at 3328–30.

The Court found that the right to compensation was, at most,[10] a claim for a taking, a claim which is between the government and others, and does not require judicial determination but is susceptible of it. *See Crowell v. Benson*, 285 U.S. 22, 50, 52 S.Ct. 285, 292, 76 L.Ed. 598 (1932). Moreover, the Court indicated that: "Congress has the power, under Article I, to authorize an agency administering a complex regulatory scheme to allocate costs and benefits among voluntary participants without providing an Article III adjudication." *Thomas*, 473 U.S. at 589, 105 S.Ct. at 3337. Of course, the costs and benefits were incurred in connection with a public regulatory program safeguarding the public health. *Id.* All Congress did in *Thomas* was to collapse these two public rights inquiries. The Court also noted that the arbitration scheme incorporated its own system of internal sanctions and relied, at most, tangentially on the judicial branch for enforcement.[11]

The rather limited scope of *Thomas* is demonstrated by the later conclusion in *Granfinanciera* that

> [i]f a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, and

---

**10.** Those manufacturers who submitted data without notice of the scheme established by the 1978 amendments to FIFRA might have a claim for a taking of property interests protected by state law. Those who submitted data with such notice had no such interest. *Thomas,* 473 U.S. at 584–85, 105 S.Ct. at 3334–45.

**11.** Further comment on the "public rights" doctrine was provided in *Commodity Futures Trad-*

*ing Comm'n v. Schor,* 478 U.S. 833, 854, 106 S.Ct. 3245, 3258, 92 L.Ed.2d 675 (1986), where the Court noted that

> where private, common law rights are at stake, our examination of the congressional attempt to control the manner in which those rights are adjudicated has been searching.

In this case, private common law rights are at stake, and our examination is accordingly searching.

if that right neither belongs to nor exists against the Federal Government, then it must be adjudicated by an Article III court. If the right is legal in nature, then it carries with it the Seventh Amendment's guarantee of a jury trial.

109 S.Ct. at 2797.

This formulation in *Granfinanciera* does not conflict with *Crowell v. Benson,* 285 U.S. at 22, 52 S.Ct. at 285, which upheld a system for compensation under the Longshoremen's and Harbor Workers' Compensation Act, equivalent to worker's compensation, for injuries to employees occurring upon the navigable waters of the United States, where recovery through state workmen's compensation laws was unavailable. *Id.* at 38, 52 S.Ct. at 287. The act was administered by the United States Employees' Compensation Commission, and claims were investigated, hearings held, and judgments made by deputy commissioners. Findings of fact by a deputy commissioner "arising with respect to injuries to employees within the purview of the act ... supported by evidence and within the scope of his authority" were deemed final. *Id.* at 46, 52 S.Ct. at 291.

*Granfinanciera* is distinguishable from *Crowell* on two bases. First, *Crowell* involved admiralty jurisdiction, and

> [i]n cases of equity and admiralty, it is historic practice to call to the assistance of the courts, without the consent of the parties, masters, and commissioners or assessors, to pass upon certain classes of questions.... While the reports of masters and commissioners in such cases are essentially of an advisory nature, it has not been the practice to disturb their findings when they are properly based upon evidence, in the absence of errors of law, and the parties have no right to demand that the court shall redetermine the facts thus found.

*Crowell,* 285 U.S. at 51–52, 52 S.Ct. at 292–93.

Civil causes of action in admiralty are not "Suits at common law" for Seventh Amendment purposes. *See Waring v.*

*Clarke,* 46 U.S. (5 How.) 440, 12 L.Ed. 226 (1847); *Parsons v. Bedford, supra* at p. 437.

The second distinction between *Granfinanciera* and *Crowell* is that *Crowell* was a public rights action, as that term is now, post-*Thomas,* defined, in that it involved rights that were an integral part of a public regulatory scheme, assigned to an administrative agency. *See* 109 S.Ct. at 2797 n. 10. On the other hand, *Granfinanciera* was a fraudulent conveyance action based on private rather than public rights. While the restructuring of the debtor-creditor relationship might be a public right,[12]

> 'matters from their nature subject to "a suit at common law or in equity or admiralty" ' lie at the 'protected core' of Article III judicial power.... There can be little doubt that fraudulent conveyance actions by bankruptcy trustees—suits, which, we said in *Schoenthal v. Irving Trust Co.,* 287 U.S., at 94–95, 53 S.Ct., at 51 (citation omitted), 'constitute no part of the proceedings in bankruptcy but concern controversies arising out of it'— are quintessentially suits at common law that more nearly resemble state-law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy *res.* They therefore appear matters of private rather than public right.

*Granfinanciera,* 109 S.Ct. at 2798 (citations omitted).

Beard's action does not merely "resemble a state-law contract [action] brought by a bankrupt corporation to augment the bankruptcy estate"—it *is* such an action. Accordingly, it is clearly a matter of private right and we therefore conclude that Braunstein was entitled under the Seventh Amendment to the jury trial he sought on Beard's claim for rent.

## IV. Impact of Braunstein's counterclaim

▮ Beard, however, citing *Baldwin–United Corp. v. Thompson,* 48 B.R. 49

---

**12.** *Granfinanciera* specifically refused to "defend" this "thesis," and noted that it "has met

with substantial scholarly criticism." *See* 109 S.Ct. at 2797 & n. 11.

(Bankr. S.D. Ohio 1985), argues that Braunstein consented to the jurisdiction of the bankruptcy court by filing a counterclaim. However, the *Baldwin–United* court did not predicate its jurisdiction to decide the trustee's original claim on the assertion of the counterclaim, as it determined that it had core jurisdiction over the trustee's claim as it was a turnover proceeding on matured notes. The court then found that, by filing the counterclaim and presenting proofs of claim, Thompson had consented to its jurisdiction over the counterclaim itself. *Id.* at 54–55. Thus, the trustee's claims stood on their own jurisdictional footing. *Id.* at 54.

We also note that the counterclaim in *Baldwin–United* was permissive. *See id.* at 55 n. 5. By contrast, Braunstein's counterclaim was compulsory,[13] and was only made after his motion to dismiss was denied on the grounds that the proceeding was core. *See In re Castlerock Properties,* 781 F.2d 159, 161–63 (9th Cir.1986). We agree that the "better rule ... is that defendant does not waive objections to jurisdiction and venue by asserting a compulsory counterclaim." 6 Wright, Miller & Kane, Federal Practice and Procedure Civil 2d § 1416 at 125 (1990). *See also In re Kaiser Steel Corp. v. Frates,* 911 F.2d 380 (10th Cir.1990); *Dragor Shipping Corp. v. Union Tank Car Corp.,* 378 F.2d 241, 244 n. 4 (9th Cir.1967) (a finding that a defendant has waived his objections to jurisdiction and venue by interposing a compulsory

counterclaim " 'is something less than fair play.' ").

## V. Where must the trial take place?

Given that Braunstein is entitled to a jury trial, in what forum must that trial take place? In answering this question, it is important to determine whether this is a core or non-core proceeding, for if it is the former, we will have to determine whether the bankruptcy court can hold such a trial. If this is a non-core proceeding, then 28 U.S.C. § 157(c)(1) requires that we remand the case to the district court for withdrawal of the reference of the Chapter 7 proceeding to the extent that the district court will hold a jury trial over this adversary action.

Section 157(c)(1) provides that:

A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district court after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

On the other hand, the Seventh Amendment concludes "no fact tried by a jury, shall be otherwise re-examined in any

---

**13.** We conclude that the counterclaim was compulsory because it arose out of the same transaction as the original claim. As we explained in *Great Lakes Rubber Corp. v. Herbert Cooper Co.,* 286 F.2d 631, 634 (3d Cir.1961),

a counterclaim is logically related to the opposing party's claim when separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts. Where multiple claims involve many of the same factual issues ... the doctrine of *res judicata* compels the counterclaimant to assert in the same suit....

Braunstein alleged the poor condition of the premises as both a defense to the action for rent and the cause of the damages for which he counterclaimed.

We acknowledge that Bankr. R. 7013, though providing generally that Fed.R.Civ.P. 13 applies in adversary proceedings, differs from that rule

in that under the bankruptcy rule, "a party sued by a trustee ... need not state as a counterclaim any claim that the party has against the debtor, the debtor's property, or the estate, unless the claim arose after the entry of the order for relief." Braunstein's counterclaim does not specify whether his damages or claim arose pre- or post-petition. However, Bankr. R. 3002(c) provides, with inapplicable exceptions, that "[i]n a Chapter 7 liquidation ... a proof of claim shall be filed within 90 days after the first date set for the meeting of creditors called pursuant to § 341(a) of the Code." In Greater Pittsburgh's Chapter 7 proceeding, the section 341(a) meeting was first set for March 22, 1985, and thus when the counterclaim was filed on March 18, 1986, unfiled pre-petition claims were barred and Braunstein had not filed a claim. Accordingly, the only viable counterclaim filed by Braunstein was compulsory.

Court of the United States, than according to the rules of the common law." In *Parsons v. Bedford*, 28 U.S. (3 Pet.) at 275, the Supreme Court held that "[t]he only modes known to the common law to re-examine such facts, are the granting of a new trial by the court where the issue was tried, or to which the record was properly returnable; or the award of a *venire facias de novo*, by an appellate court, for some error of law which intervened in the proceedings." In *Capital Traction Co. v. Hof*, 174 U.S. 1, 13, 19 S.Ct. 580, 585, 43 L.Ed. 873 (1899), the Court held that "unless a new trial has been granted [as allowed by the common law], facts once tried by a jury cannot be tried anew, *by a jury or otherwise*, in any court of the United States." (Emphasis added.)

■ The Seventh Amendment limitations on the review of jury findings are not compatible with section 157(c)(1), which requires that any contested finding by the bankruptcy court must be reviewed de novo.[14] By the Seventh Amendment, any fact found by a jury cannot be reviewed de novo. Accordingly, a bankruptcy court cannot conduct a jury trial in a non-core proceeding. *See In re United Missouri Bank*, 901 F.2d 1449, 1453 (8th Cir.1990); Gibson, *Jury Trials in Bankruptcy: Obeying the Commands of Article III and the Seventh Amendment*, 72 Minn.L.Rev. 967, 1046–47 (1988).

## VI. Core/Non-core

■ Is the current proceeding core? The answer may be found in Justice Rehnquist's concurrence in *Northern Pipe Line Construction Co. v. Marathon Pipeline Co.*, 458 U.S. at 89, 102 S.Ct. at 2881.[15] Northern, a debtor in bankruptcy, sued Marathon for alleged breaches of contract and warranty, as well as alleged misrepresentation, coercion, and duress. Justice Rehnquist noted that charges in the suit

filed by the debtor, including breach of contract

> are the stuff of the traditional actions at common law tried by the courts at Westminster in 1789. There is apparently no federal rule of decision provided for any of the issues in the lawsuit; the claims of Northern arise entirely under state law.

*Id.* at 90, 102 S.Ct. at 2881.

Justice Rehnquist concluded that Marathon could not be unwillingly brought before a non-Article III federal tribunal on these sorts of claims, subject only to appellate review. *Thomas'* reading of the *Marathon* holding was consistent:

> Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review.

*Thomas*, 473 U.S. at 584, 105 S.Ct. at 3334.

In *Granfinanciera*, Justice Blackmun, even though dissenting, acknowledged that "Congress, for example, could not designate as 'core bankruptcy proceedings' state-law contract actions brought by debtors against third parties. Otherwise, *Northern Pipeline* would be rendered a nullity." 109 S.Ct. at 2817.

The current action is based partly on pre-petition rents and partly on post-petition rents. It is clear that to the extent that the claim is for pre-petition contract damages, it is non-core. What of post-petition contract damages? There is a split of authority on this point. In *In re Castlerock Properties, Inc.*, 781 F.2d at 159, the Court of Appeals for the Ninth Circuit observed that "a court should avoid characterizing a proceeding as 'core' if to do so would raise constitutional problems. The apparent broad reading that can be given to 157(b)(2) should be tempered by the *Mar-*

---

**14.** Of course, the bankruptcy judge can "hear and determine" even a non-core matter with the consent of all the parties, but in this case Braunstein does not consent.

**15.** The plurality in *Marathon* was composed of Justices Brennan, Marshall, Blackmun, and Stevens. The concurrence was written by Justice

Rehnquist, joined by Justice O'Connor. Inasmuch as the holding of the concurrence was more limited than that of the plurality, it is the concurrence's holding that governs. *See Marathon*, 458 U.S. at 92, 102 S.Ct. at 2882 (Burger, C.J., dissenting).

*athon* decision." 781 F.2d at 162. The court held that state law contract claims which do not fall within the specific categories of core proceedings listed in 28 U.S.C. §§ 157(b)(2)(B)–(N) are non-core, even if they arguably fall within the two "catch-all" provisions of section 157(b)(2)(A) ("matters concerning the administration of the estate") or section 157(b)(2)(O) ("other proceedings affecting the liquidation of the assets of the estate"). "To hold otherwise would allow the bankruptcy court to enter final judgments that this court has held unconstitutional." 781 F.2d at 162.

Beard argues that this case falls into one of the specific provisions, namely, section 157(b)(2)(E) orders to turn over property of the estate. Such an action is limited to property in the actual or constructive possession of the bankruptcy court. Constructive possession

> exists where the property was in the physical possession of the debtor at the time of the filing of the petition in bankruptcy, but was not delivered by him to the trustee, where the property was delivered to the trustee, but was thereafter wrongfully withdrawn from his custody; where the property is in the hands of the bankrupt's agent or bailee; where the property is held by some other person who makes no claim to it; and where the property is held by one who makes a claim, but the claim is colorable only.

*Taubel–Scott–Kitzmiller Co. v. Fox*, 264 U.S. 426, 432–33, 44 S.Ct. 396, 398–99, 68 L.Ed. 770 (1924).

While a chose in action is property of the estate, and the bankruptcy court can determine who owns it, "the bankruptcy court does not have summary jurisdiction to *enforce* a chose in action against the bankrupt's obligor, even when the bankrupt's rights seem clear." *In re Lehigh and Hudson River Ry. Co.*, 468 F.2d 430, 433 (2d Cir.1972) (emphasis in original). Though *Lehigh and Hudson* was decided under the 1898 law, the principle seems perfectly appropriate to distinguish between a "core" turnover proceeding and a "non-core" state-law contract action. *See*

*Matter of Century Brass Products, Inc.*, 58 B.R. 838 (Bankr.D.Conn.1986). *See also St. George Island, Ltd. v. Pelham*, 104 B.R. 429 (Bankr.N.D.Fla.1989); *Republic Reader's Service v. Magazine Service Bureau, Inc.*, 81 B.R. 422, 429 (Bankr.S.D. Tex.1987).

As one leading treatise notes:

> The categorization of 'orders to turn over property of the estate' as core proceedings has misled some courts into expanding bankruptcy court jurisdiction beyond that permissible under *Marathon*. For example, it has been held that an action on matured promissory notes given pursuant to a stock purchase plan is a turnover proceeding under section 542 and is therefore a core proceeding. Similarly, an action to recover retentions on a construction contract has been held to be a turnover proceeding. The problem with these cases is that, under their rationale, every action brought by a trustee or debtor in possession to recover money or property could conceivably be characterized as a turnover proceeding, effectively eradicating *Marathon*.

1 Collier on Bankruptcy ¶ 3.01[2][b][iii] at 3–42–43 (15th ed. 1989).

In *Matter of Wood*, 825 F.2d 90 (5th Cir.1987), the court held that "a proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Id.* at 97. This case does not meet this test, since it is a garden variety contract claim and is not against the bankruptcy estate. *See also Barnett v. Stern*, 909 F.2d 973 (7th Cir.1990).

On the other hand, *In re Arnold Print Works, Inc.*, 815 F.2d 165 (1st Cir.1987), held that a post-petition contract action was a core proceeding. The *Arnold* court distinguished *Marathon* by noting that in *Marathon* the contract claim arose pre-petition, while in *Arnold* the contract claim was based on a post-petition contract. While we agree with the *Arnold* court that

in fact *Marathon* was based on pre-petition conduct,[16] there is no indication that either the plurality or the concurrence in *Marathon* relied on this distinction.

*Arnold Print Works* examined the legislative history of the 1984 Act, and concluded that "Congress intended that 'core proceedings' would be interpreted broadly, close to or congruent with constitutional limits." *Id.* at 168. The court then concluded that "The Constitution permits a non-Article III bankruptcy court to adjudicate post-petition claims related to the administration or liquidation of a debtor's estate because the claims are both historically and functionally distinguishable from those at issue in *Marathon*," *id.* at 169, since these contracts are made "with officers of the court." [17] *Id.*

Our case is distinguishable. The contract in *Arnold* was a sale of assets of the estate and was thus itself an integral part of the bankruptcy, while the contracts here are merely for rent, and are therefore only tangentially related to the bankruptcy. Moreover, the contract in *Arnold* was *entered into* post-bankruptcy. The court of appeals noted that while

[a] party who contracts with an apparently healthy company—a company that has not filed a petition in bankruptcy—may find it unpleasantly surprising to have to defend its *pre*-petition contract in a bankruptcy court, without a jury or Article III protections. But it is difficult to see any unfair surprise in bringing a post-petition contract action before a bankruptcy court. Parties who contract with a bankrupt company's trustee or with a debtor-in-possession know that they are dealing with an agent responsible to a bankruptcy court; that the bankruptcy court

would resolve subsequent disputes should therefore come as no surprise. 815 F.2d at 170.

Here, although part of the rent accrued post-petition, the leases were between Braunstein and an "apparently healthy" Greater Pittsburgh Development Corp.

In *In re Ben Cooper, Inc.,* 896 F.2d 1394 (2d Cir.1990), *cert. granted,* — U.S. —, 110 S.Ct. 3269, 111 L.Ed.2d 779 (1990), the contract involved was an insurance contract entered into to comply with the plan of reorganization, which required coverage to protect the debtor's assets. The insurance company was aware of the debtor's Chapter 11 status when it wrote the policy. *Ben Cooper,* relying on and adopting much of the reasoning in *Arnold Print Works,* concluded that this contract was integral to the administration of the estate, and that disputes regarding it were clearly core. 896 F.2d at 1399. The court also held that even though the case involved a core proceeding, a jury trial could be held in the matter in the bankruptcy court. *Ben Cooper* therefore is distinguishable much as is *Arnold.*

We conclude that this action, involving pre-petition contracts, allegedly breached both before and after the filing of the petition, is entirely a non-core matter related to a case arising under title 11.[18] We are not presented with and thus do not decide whether a claim for the breach of a post-petition contract, or a claim only for the post-petition breach of a contract entered into pre-petition, are core matters.

## HEARING ON SANCTIONS

During discovery, Beard sent interrogatories to Braunstein. Braunstein objected to their number, and moved that they be stricken, or be repropounded and alterna-

---

**16.** *See Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* 6 B.R. 928, 931 (Bankr.D. Minn.1980) (original bankruptcy court decision in *Northern Pipeline* ).

**17.** Collier's agrees:

The better result is that [post-petition accounts receivable] proceeding[s are] core; such a cause of action 'arises in' the title 11

case, and was not owned by the debtor at the time the title 11 case was commenced.

1 Collier on Bankruptcy ¶ 3.01[2][b][iv] at 3–50.

**18.** We also point out that some of the same issues are involved as to both pre-petition and post-petition rents. In the circumstances, even if the post-petition rent claims are core matters, it is difficult to understand why there would not be a single jury trial before a district judge.

tively asked for additional time to respond to them. He requested oral argument on this motion. *See* App. at 80–83. On August 19, 1986, the motions were denied, and Braunstein was directed to file his answers within 20 days. On September 16, 1986, Braunstein served his answers to the interrogatories. On October 22, 1986, Beard, considering certain of the answers nonresponsive, made a motion under Bankr.R. 7037 and Fed.R.Civ.P. 37(a)(3) (evasive or incomplete answer) to compel more comprehensive answers, and requested attorney's fees under Fed.R.Civ.P. 37(a)(4). *See* App. at 89. He attached copies of the answers to which he objected to this motion.[19] On November 8, 1986, Braunstein filed a response which simply denied the averments of the motion and asserted that his answers were complete, but gave no explanations, and requested oral argument.[20] On November 11, 1986, an order was signed granting the motion for more definite an-

swers and awarding $420 in attorney's fees as a sanction. *See* App. at 108. A motion for reconsideration was denied on January 5, 1987.

▮▮▮ Rule 37(a)(4) requires an opportunity for hearing before an award of sanctions. On appeal, Braunstein's contentions boil down to the denial of his "right" to be heard *orally*, a contention controlled by our recent decision in *Jones v. Pittsburgh National Corp.*, 899 F.2d 1350, 1358–59 (3rd Cir.1990).[21] In *Jones* we held that a rigid rule defining the meaning of "occasion to respond" in sanctions proceedings was undesirable. Instead:

> The circumstances must dictate what is required.... [W]e think a district court in the exercise of its sound discretion must identify and determine the legal basis for each sanction charge sought to be imposed, and whether its resolution requires further proceedings, including the need for an evidentiary hearing.

**19.** As an example, Braunstein, when asked to "specify the exact amount of square footage occupied by Defendant in the Brandywine Building since November 1984," answered "Defendant cannot determine the exact amount of square footage occupied by Defendant in the Brandywine building since November of 1984." When asked to "Identify all persons you intend to call at the time of trial in support of the foregoing answer," Braunstein referred to his answer to a previous interrogatory, which was:

1. Plaintiff;
2. Any and all employees, agents, representatives or servants or former employees, agents, representatives and servants of the Plaintiff or Plaintiff's predecessor;
3. Defendant, employees, agents, representatives or servants or former employees, agents, representatives and servants of the Defendant;
4. Any and all persons named in discovery filed or to be filed in this action;
5. Any customers, suppliers, or trades people with whom Defendant has dealt during the relevant periods in question;
6. Any and all persons discovered or mentioned in discovery in this action.
7. Defendant is still endeavoring to determine additional person [sic] who will testify in response to this interrogatory.

*See* App. at 95.

Braunstein refused to respond, "on the grounds of relevancy," to an interrogatory inquiring whether he had subleased any of the leased space. In the motion to compel more comprehensive answers, Beard noted that Braunstein had alleged that the value of the premises was less than the rental amount, and

that existence and amount of any rentals received by Braunstein would be relevant in resolving this issue. App. at 91–92.

**20.** The response indicated:

1. The averments of paragraphs 1, 2, 3, 4, and 8 of Plaintiffs Motion are admitted in so far as consistent with the record filed in the within action, in all other respect said averments are denied. Strict proof thereof is demanded at time of hearing.

2. The averments of paragraphs 5, 9 and 10 of the Motion constitute conclusions of law to which no response is required and the same are therefore denied.

3. The averments of paragraph 6 of the Motion constitute conclusions of law to which no response is required and the same are therefore denied. However, and by way of further answer, Defendant asserts that Defendant has filed complete Answers to the Interrogatories in this action.

4. The averments of paragraph 7 of the Motion are denied for the reason that Defendant, after reasonable investigation, is without sufficient knowledge or information to formulate a belief as to the truth of same. Strict proof thereof is demanded at the hearing on the case. By way of further answer, however, Defendant asserts that the Interrogatories mentioned in paragraph 7 have been satisfactorily answered. App. at 111–12.

**21.** Braunstein's argument regarding the sanctions seems not to include a contention that the imposition of the sanction was a substantive error. Clearly it was not.

... [T]he rule we have announced ... permits some cases to be disposed of on the record and, to that extent, prevents unnecessary expenditure of judicial time.

The hearing afforded Braunstein was adequate. He was clearly put on notice of which answers to interrogatories were claimed to be objectionable, and of the exact sanction requested. The deficiencies in the answers were apparent on their face. Given an opportunity to explain, Braunstein chose not to do so, and relied on the answers and his request for oral argument. We review orders regarding the scope and conduct of discovery for abuse of discretion, *see Marroquin–Manriquez v. I.N.S.*, 699 F.2d 129, 134 (3d Cir.1983), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984), and in the circumstances, the bankruptcy court acted well within the bounds of its discretion in concluding that oral argument was unnecessary and that a $420 sanction was warranted.

### CONCLUSION

The order of the district court of January 25, 1990, will be vacated to the extent that it affirmed the order of the bankruptcy court of April 20, 1987. It will be affirmed to the extent that it affirmed the orders of November 11, 1986, and January 5, 1987 in the bankruptcy court relating to sanctions. The matter will be remanded to the district court to enter an order vacating the order of the bankruptcy court of April 20, 1987, to withdraw the reference of this adversary proceeding and to conduct a jury trial.