

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-29-1997

# In Re: Continental Airlines

Precedential or Non-Precedential:

Docket
96-7028,96-7038

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation
"In Re: Continental Airlines" (1997). *1997 Decisions.* Paper 213.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/213

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 29, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 96-7028 and 96-7038

IN RE: CONTINENTAL AIRLINES,

        Debtor

AIR LINE PILOTS ASSOCIATION

v.

CONTINENTAL AIRLINES

LPP CLAIMANTS; EFFECTIVE DATE COMMITTEE,

        Claimants

HONORABLE JOHN STONITSCH,

        Trustee

LPP CLAIMANTS,

        Appellant No. 96-7028

(Caption amended in accordance with
Clerk's Order dated 3/4/96)

IN RE: CONTINENTAL AIRLINES,

        Debtor

AIR LINE PILOTS ASSOCIATION

v.

CONTINENTAL AIRLINES

LPP CLAIMANTS; EFFECTIVE DATE COMMITTEE,

        Claimants

HONORABLE JOHN STONITSCH,

        Trustee

CONTINENTAL AIRLINES, INC.,

Appellant No. 96-7038

(Caption amended in accordance with
Clerk's Order dated 3/4/96)

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

(D.C. Civil No. 93-cv-00163)

ARGUED MARCH 13, 1997

BEFORE: MANSMANN, LEWIS and
MICHEL,* Circuit Judges.

(Filed August 29, 1997)

_____

* Honorable Paul R. Michel, Circuit Judge for the United States Court of
Appeals for the Federal Circuit, sitting by designation.

Jon A. Geier (ARGUED)
Paul, Hastings, Janofsky & Walker
1299 Pennsylvania Avenue, N.W.
10th Floor
Washington, DC 20004

Laura D. Jones
Robert S. Brady
Young, Conaway, Stargatt & Taylor
Post Office Box 391
Rodney Square North, 11th Floor
Wilmington, DE 19899-0391

 Attorneys for Continental Airlines

Michael J. Isaacs
Agostini, Levitsky & Isaacs
623 King Street
Post Office Box 2323
Wilmington, DE 19899

Myles J. Tralins (ARGUED)
Tralins & Associates
One Biscayne Tower
2 South Biscayne Boulevard

Suite 3310
Miami, FL 33131

 Attorneys for LPP Claimants

John A. McGuinn (ARGUED)
Schmeltzer, Aptaker & Shepard
2600 Virginia Avenue, N.W.
Suite 1000
Washington, DC 20037

Attorney for Eastern Pilots Merger
Committee

3

OPINION OF THE COURT

LEWIS, Circuit Judge.

In this appeal and cross-appeal, we are confronted with a tension between bankruptcy law and labor law. The dispute arose when the Air Line Pilots Association, Inc. ("ALPA"), collective bargaining agent for Eastern Air Lines' ("Eastern") pilots, filed proofs of claim in bankruptcy court against Continental Airlines Holdings, Inc. and Continental Airlines, Inc. ("Continental"). These claims were based on alleged seniority integration rights stemming from a pending labor arbitration dispute and were filed following Continental's acquisition of Eastern and subsequent refusal to bargain over the seniority integration of Eastern's pilots.

The bankruptcy court determined that the claims could be satisfied by monetary awards in lieu of specific performance and enjoined scheduled arbitration proceedings to enforce the seniority rights under the collective bargaining agreement. The district court affirmed the bankruptcy court's determination relating to the claims, but vacated the injunction. Two groups of former Eastern pilots, the LPP Claimants and the Group of 31, both of which are no longer represented by ALPA, appealed to this court.[1]

Resolution of this dispute requires us to determine: (1) whether the bankruptcy claims that the LPP Claimants and the Group of 31 seek to enforce constitute "claims" within the meaning of the bankruptcy code and thus are satisfiable, in the alternative, by a monetary award; and (2) whether the arbitration of a labor dispute that may give rise

_____

1. "LPP Claimants" refers to a group of former Eastern pilots whose

claims in this appeal are based on certain "labor protective provisions" (LPPs) contained in the collective bargaining agreement. The "Group of 31" is a group of former Eastern pilots, who originally were part of the "LPP Claimants" group and who have retained separate counsel for purposes of this appeal. See discussion infra Part I.D. While both groups claims were filed in bankruptcy court by ALPA on their behalf, these two groups are no longer represented by ALPA. See discussion infra note 5.

4

to the right to seniority integration under a collective bargaining agreement can be enjoined, where the debtor has not explicitly rejected the agreement. We conclude that the rights to seniority integration do constitute "claims" within the meaning of the bankruptcy code. Accordingly, we find that the right to seniority integration gives rise to a right of payment and that any equitable remedy recovered against Continental via arbitration of the underlying labor dispute may be satisfied through an award of monetary damages. We further conclude that the district court properly vacated the injunction barring arbitration of the underlying labor dispute. Thus, we will affirm.

I.

A. The Underlying LPP Dispute

On February 23, 1986, following intense negotiations, Eastern and its pilots' union, ALPA, ratified a collective bargaining agreement. On February 24, 1986, the Texas Air Corporation ("Texas Air"), parent corporation to Continental, acquired Eastern. Believing that the acquisition constituted a "merger" within the meaning of certain "labor protective provisions" (LPPs) contained in the collective bargaining agreement, ALPA requested a meeting with Texas Air, Eastern, and Continental to discuss the integration of Eastern's and Continental's seniority lists. Under the LPPs, Eastern's pilots secured protection of their seniority rights in the event of a merger between Eastern and another airline carrier through the integration of Eastern's seniority lists with the merging carrier's list. Specifically, the LPP terms provide:

> Section 2(a). The term "merger" as used herein means joint action by the two carriers whereby they unify, consolidate, merge, or pool in whole or in part their separate airline facilities or any of the operations or services previously performed by them through such separate facilities.

* * *

Section 3.  Insofar as the merger affects the seniority rights of the carriers' employees, provisions shall be

5

made for the integration of seniority lists in a fair and equitable manner, including, where applicable, agreement through collective bargaining between the carriers and the representative of the employees affected. In the event of failure to agree, the dispute may be submitted by either party for adjustment in accordance with section 13.

* * *

Section 13(a).  In the event that any dispute or controversy . . . arises with respect to the protections provided herein, which cannot be settled by the parties within 20 days after the controversy arises, it may be referred by any party to an arbitrator selected from a panel of seven names furnished by the National Mediation Board for consideration and determination.

(Labor Protective Provisions, sections 2(a), 3, and 13(a)).2

Despite ALPA's requests, both Eastern and Continental refused to bargain with ALPA about the integration of the seniority lists. Consequently, ALPA requested the National Mediation Board to proffer a list of seven arbitrators from which a neutral arbitrator could be chosen to determine whether an alleged merger occurred between Eastern and Continental that triggered the LPP seniority integration provision (LPP dispute). Eastern, however, filed for bankruptcy in March, 1989, and refused to submit to arbitration pursuant to the bankruptcy code's section 362 automatic stay provision. 11 U.S.C. S 362 (providing that petitions filed pursuant to Chapter 11 operate as a stay of the commencement or continuation of judicial, administrative, or other actions or proceedings against the debtor). In bankruptcy court, ALPA sought relief from the automatic stay to compel Eastern to arbitrate the LPP

_____

2. The LPPs were based on the standard Allegheny-Mohawk LPPs, which were designed to provide "displacement and dismissal allowances to employees adversely affected by [merger] transaction[s], the equitable integration of seniority lists, and binding arbitration of disputes relating
to the LPPs." (Decision of the Eastern Air Lines Pilots System Board of Adjustment). See Air Line Pilots Ass'n v. Dept. of Transp., 838 F.2d 563, 565 (D.C. Cir. 1988) (citing Allegheny-Mohawk Merger Case, 59 C.A.B. 22 (1972)).

dispute. The bankruptcy court denied ALPA's petition. After much litigation, however, the Court of Appeals for the Second Circuit held that the section 362 automatic stay provision did not preclude arbitration in this instance. See In re Ionosphere Clubs, Inc., 922 F.2d 984 (2d Cir. 1990).

ALPA and Eastern proceeded to arbitration in April, 1991, commencing with a pre-hearing conference before Richard R. Kasher (Kasher Arbitration). In this proceeding, ALPA sought prospective integration of seniority lists, back pay from the effective date of the merger to the date of the arbitration award, and front pay from the date of the arbitration award to the date that the Eastern pilots would complete training and begin flying for Continental. Prior to the pre-hearing conference, Arbitrator Kasher solicited brief statements of position from the parties to the dispute, and from all potential parties. Eastern consistently maintained that the LPP dispute was not properly within the arbitrator's jurisdiction.3 Continental filed a statement informing Arbitrator Kasher that it had filed a Chapter 11 petition for reorganization in December, 1990. Therefore, it maintained that the arbitration pursued by ALPA was stayed under section 362 of the bankruptcy code and could not proceed without the express approval of the bankruptcy court.

In August, 1992, Arbitrator Kasher issued a decision concluding that he had jurisdiction over the LPP dispute, and could render a determination of the appropriate remedies under the circumstances. Kasher, relying on the bankruptcy court's determination in In re Ionosphere Clubs, Inc., 114 B.R. 379 (Bankr. S.D.N.Y. 1990), specifically rejected Continental's suggestion that the arbitration was barred by the automatic stay. Kasher scheduled hearings on the merits of the dispute, to commence in February, 1993.

_____

3. Eastern maintained that only the System Board of Adjustment had jurisdiction to determine whether a merger occurred that triggered the LPPs. On the merits, Eastern contended that if the arbitration proceeded, the Arbitrator should conclude that no merger occurred.

B. The Bankruptcy Court Proceedings

In September, 1991, while the initial Kasher Arbitration decision was pending, ALPA, on behalf of its members, filed proofs of claim against Continental in Delaware Bankruptcy Court. Their claims were based on the asserted right to seniority integration under the LPPs and specified an unliquidated amount as the debt for which Continental was obligated. In response, Continental initiated an adversary proceeding in bankruptcy court against ALPA, seeking injunctive and declaratory relief relating to the proofs of claim. In that action, Continental filed a Partial Objection To Allowance of Claims and a Motion for Partial Summary Judgment on its Partial Objection.4 In both motions, Continental contended that the seniority integration that the claimants sought was not feasible because it would be detrimental to Continental's successful reorganization. Thus, Continental sought a declaration that the claims were, at best, "general, dischargeable, pre-petition, unsecured claims," compensable by an award of monetary damages.

ALPA and the LPP Claimants each filed a separate response to Continental's Partial Objection and Motion for Partial Summary Judgment.5 ALPA contended that, contrary to Continental's argument, the claims pursued were not general, unsecured pre-petition claims that could be converted to a payment of money damages. ALPA also argued that only an arbitrator had jurisdiction to determine

_____

4. Prior to the Kasher Arbitration decision, Continental filed an initial motion for partial summary judgment, seeking a preliminary injunction. Continental argued that the arbitration should be enjoined to protect the jurisdiction of the bankruptcy court over the administration of its estate.
It also maintained that the automatic stay provision of the bankruptcy code precluded the arbitration from proceeding. Finally, Continental contended that it was not a party to the collective bargaining agreement between Eastern and ALPA and that it could not be bound by the result of any arbitration over the LPPs.

5. ALPA's representation of the LPP Claimants ceased after the LPP Claimants instituted actions in federal court against ALPA. The actions alleged causes of action for the breach of the duty of fair representation and defamation arising out of the publication and dissemination of a "blacklist" and for alleged violations of the civil provisions of RICO.

the appropriate remedy under the LPPs. The LPP Claimants essentially maintained that an arbitration proceeding was the appropriate forum to determine the issue of whether a merger occurred that triggered the LPPs, and that the

proper remedy was integration of Eastern's seniority lists with Continental's lists.

In February, 1993, the bankruptcy court judge, in two orders, granted Continental's Partial Objection To Allowance of Claims and its related motion for partial summary judgment, determining that there was no genuine issue for trial and that Continental was entitled to judgment as a matter of law. In re Continental Airlines, Inc., et al., Nos. 90-932 through 90-984 (Bankr. D. Del. Feb. 11, 1993) (order granting motion for partial objection to allowance of claims); In re Continental Airlines, Inc., et al., No. 91-153 (Bankr. D. Del. Feb. 11, 1993) (order granting motion for partial summary judgment). Addressing the jurisdictional argument asserted by ALPA, the bankruptcy court concluded that the issue of whether any award granted to ALPA would constitute general, unsecured, pre-petition claims was a core matter under the bankruptcy code. Thus, it concluded that it had jurisdiction to resolve the matter. In re Continental Airlines, Inc., et al., Nos. 90-932 through 90-984, slip op. at 1-2 (order granting motion for partial objection to allowance of claims); In re Continental Airlines, Inc., et al., No. 91-153, slip op. at 2 (order granting motion for partial summary judgment). The court then determined that the equitable remedy of seniority integration constituted a "claim" within the meaning of S 101(5) of the bankruptcy code. Accordingly, the court concluded that the remedy could be converted to an award of money damages. In re Continental Airlines, Inc., et al., Nos. 90-932 through 90-984, slip op. at 3-4 (order granting motion for partial objection to allowance of claims); In re Continental Airlines, Inc., et al., No. 91-153, slip op. at 3-4 (order granting motion for partial summary judgment). Finally, the court determined that any right of payment asserted by ALPA was, at best, a general, dischargeable, unsecured claim that was entitled to no administrative priority. In re Continental Airlines, Inc., et al., Nos. 90-932 through 90-984, slip op. at 4-5 (order granting motion for partial objection to allowance of claims); In re Continental

Airlines, Inc., et al., No. 91-153, slip op. at 5 (order granting motion for partial summary judgment).

In April, 1993, Continental's Second Amended Joint Plan of Reorganization was confirmed by the bankruptcy court. The court's confirmation order incorporated its prior rulings from the two orders issued in February, 1993. Essentially, it clarified that any valid claims based on the LPPs would give rise to a right of payment dischargeable in bankruptcy and that no right to injunctive, equitable or other

prospective relief would flow from any valid claim based on an award under the LPPs. In re Continental Airlines, Inc., et al., Nos. 90-932 through 90-984 (Bankr. D. Del. April, 1993) (Findings of Fact, Conclusions of Law and Order Confirming the Debtors' Revised Second Amended Joint Plan of Reorganization). The court also enjoined the arbitration of the LPP dispute. Continental's plan of reorganization was consummated in late April, 1993.

C. The ALPA/Continental Settlement

ALPA and the LPP Claimants appealed the bankruptcy court's February and April, 1993 orders to the district court. While the appeals were pending, ALPA and Continental settled the LPP dispute. The Settlement Agreement, ultimately approved by the bankruptcy court, finally resolved all of ALPA's claims including those pursued in Continental's bankruptcy proceeding and those based on the enforcement of the LPPs in the Kasher Arbitration. Under the terms of the agreement, ALPA agreed to withdraw its appeals to the district court. The Settlement Agreement also provided an option to the "pilots formerly employed by Eastern" who were no longer represented by ALPA, and who had filed proofs of claim in the bankruptcy proceeding, to participate in the settlement. Approximately two-thirds of these pilots did so.

D. The District Court Proceedings

Prior to the ALPA/Continental settlement, Continental filed a motion to dismiss ALPA's and the LPP Claimants' appeals. Continental argued that the appeals from the confirmation order were moot because: (1) the plan of reorganization had been substantially consummated; (2) it was not feasible for the plan to be undone; and (3) any

alteration to the plan's fundamental terms would be inequitable. After the settlement, Continental filed a second motion to dismiss the appeals as moot, contending that the LPP Claimants had no individual right to maintain their claims based on the LPPs because ALPA, as the exclusive bargaining representative of the Eastern pilots, had full authority to settle the LPP grievance. Thus, Continental argued, the pilots were bound by the settlement agreement.

In a comprehensive memorandum opinion, the district court addressed the issues appealed by ALPA and the LPP Claimants and presented in Continental's motions to dismiss.6 As to the first motion to dismiss, the court concluded, inter alia, that ALPA's and the LPP Claimants'

appeals relating to the claim for administrative priority was moot. In support of its conclusion, the court emphasized the substantial consummation of the plan. Specifically, the court noted that the investment leading to the consummation of the plan was based on an overall limit on administrative claims and a determination that ALPA and the LPP Claimants were not entitled to equitable relief. In re Continental Airlines, Inc., et al., No. 93-163 (D. Del. Nov. 29, 1995). As to Continental's second motion to dismiss as moot, the court determined that it could not consider the merits of whether the LPP Claimants had standing under the LPPs to pursue seniority integration individually. Specifically, the court concluded that this issue should be determined by the arbitrator. Therefore, the court refused to dismiss their claims based on their alleged lack of standing to assert the contractual right. Id. at 22-25. The court also rejected Continental's argument that the LPP Claimants were bound by the ALPA/Continental settlement. Id. at 23.

Turning to the merits of the appeals, the court affirmed the orders of the bankruptcy court in all respects, except for the bankruptcy court's injunction of the arbitration proceedings. Id. at 26-45. Relating to the injunction, the

_____

6. Although the ALPA/Continental settlement agreement provided that ALPA would dismiss its appeal to the district court, ALPA failed to do so prior to the district court's disposition. Ultimately, ALPA did withdraw its
claims against Continental. ALPA is not a party to this appeal.

court concluded that the bankruptcy court's failure to adequately set forth the reasons for the issuance of the injunction and to describe the acts restrained in its order, as mandated by Federal Rule of Civil Procedure 65(d), was fatal to the validity of the injunction. Id. at 34-37. Although it vacated the injunction, the district court refused to remand the matter to the bankruptcy court with instructions to strike the injunction. Rather, the court concluded that under section 1113 of the bankruptcy code, the bankruptcy court could not enjoin the arbitration even if the requirements of Rule 65(d) were met. Id. at 37-40.7

The LPP Claimants appealed the district court's order. Continental cross-appealed on the issues of the mootness of the claims and the dissolution of the injunction. On appeal, the Group of 31, a group of former Eastern pilots who previously had been represented by counsel for the LPP Claimants, have obtained substitute counsel, and have

filed a separate brief. For purposes of brevity, the Group of
31 and the LPP Claimants will be referred to collectively as
"the Claimants" where permissible.

The district court had jurisdiction under 28 U.S.C.
S 158(a). We exercise jurisdiction of the appeal and the
cross-appeal from the district court's order pursuant to 28
U.S.C. S 158(d).

II.

Our review of the district court's determination is
plenary. Brown v. Pennsylvania State Employees Credit
Union, 851 F.2d 81, 84 (3d Cir. 1988); see In re Ionosphere
Clubs, Inc., 922 F.2d 984, 988 (2d Cir. 1990). We exercise
the same review of the district court's decision as that
exercised by the district court. Brown, 851 F.2d at 84. The
bankruptcy court's findings of fact are reviewable only for
clear error. Id. Legal determinations are subject to plenary
review. Id.

_____

7. The court reached this issue only after determining that in spite of
the
invalidity of the injunction under Rule 65(d), the statutory injunction
under 11 U.S.C. S 524, referenced by the bankruptcy court in its order,
survived. In re Continental Airlines, Inc., et al., No. 93-163, slip op.
at 37,
(D. Del. Nov. 29, 1995).

Before we reach the merits of the parties' claims, we
must address Continental's two challenges to the
Claimants' appeals contending that the appeals should be
dismissed. First, Continental maintains that the LPP
Claimants' notice of appeal is defective for lack of adequate
identification of the parties to the appeal under Federal
Rule of Appellate Procedure 3(c). Next, Continental argues
that the Claimants' lack standing to assert claims for
individual seniority integration under the LPPs and that the
appeals should be dismissed as moot.

A. Appellate Jurisdiction

Continental requests that the LPP Claimants' appeal be
dismissed pursuant to Federal Rule of Appellate Procedure
3(c) for failure of their notice of appeal to identify each
member of its group participating in this appeal. The notice
of appeal filed by the LPP Claimants simply identifies the
appellants as "the LPP Claimants." Continental argues that
this identification is insufficient, emphasizing that a

number of the LPP Claimants participated in the Continental/ALPA settlement and, consequently, waived their claims on appeal. Continental contends that the notice of appeal did not specify those members who did not waive their claims and who are appealing from the district court's order. We reject this argument, and conclude that the LPP Claimants notice of appeal adequately identifies the appellants.

The requirements of Rule 3(c) are jurisdictional. Torres v. Oakland Scavenger Co., 487 U.S. 312, 320-21, 108 S. Ct. 2405, 2411, 101 L.Ed.2d 285 (1988). In Torres, the Supreme Court explained that permitting a court to exercise jurisdiction over parties not named in a notice of appeal would be equivalent to extending the time prescribed to file a notice of appeal, a power not granted to the court. Id. at 315. Thus, the failure of a notice of appeal to name a party constitutes a jurisdictional bar to the appeal, and thus a failure of that party to appeal. Dura Systems, Inc. v. Rothbury Investments, Ltd., 886 F.2d 551, 554 (3d Cir. 1989).

Generally, rules of procedure should be liberally construed. Torres, 487 U.S. at 316. In Torres, the Supreme

13

Court emphasized that, "mere technicalities should not stand in the way of consideration of a case on its merits." Id. (internal quotations omitted). Thus, in the context of Rule 3(c), jurisdiction may be appropriate if a litigant's actions are functionally equivalent to the requirements of Rule 3(c). Masquerade Novelty v. Unique Industries, 912 F.2d 663, 665 (3d Cir. 1990). We have applied this construction numerous times to support a finding of jurisdiction in the absence of strict, technical compliance with the requirements of Rule 3(c). See id. (where the contents of documents filed within the time prescribed to file a notice of appeal contain the information required by Rule 3(c), the party will be deemed to have complied with the rule and the case will not be dismissed for lack of appellate jurisdiction); Dura Systems, Inc., 886 F.2d at 554-55 (Consent Order filed by the appellants within the time prescribed to file a notice of appeal served as the "functional equivalent" of what Rule 3(c) required such that the technical failure of the actual notice of appeal was not a bar to jurisdiction); see also In re Bertoli, 812 F.2d 136 (3d Cir. 1987) (litigant's filing of a "Notice of Motion for Certification of An Interlocutory Appeal" in the district court within the thirty-day time period allowed to file a notice of appeal was sufficient to satisfy Rule 3(c) where the litigant failed to file an actual notice of appeal; the document

communicated an intention to appeal and identified the judgment appealed from and the court to which the appeal was taken).

The purpose of Rule 3(c)'s identification requirement is to provide notice to the court and the opposing parties of the identity of the appellants. Torres, 487 U.S. at 318; Dura Systems, Inc., 886 F.2d at 555. Since ALPA and the LPP Claimants filed their appeals in the district court, the LPP Claimants have been identified as a group of former Eastern pilots, no longer represented by ALPA, seeking to enforce their seniority integration rights under the LPPs. When ALPA settled its claims with Continental, both Continental and ALPA, via the settlement agreement, granted the LPP Claimants the opportunity to participate in the settlement. Continental was well aware of the individuals who elected to exercise this option. The settlement agreement specifically required those pilots

14

electing to participate in the settlement to execute one of two forms indicating an intent to participate in the settlement and to return the form to Continental. Those individuals who opted to settle their claims waived their right to appeal. Thus, the group of LPP Claimants dwindled to an identifiable, discrete entity made up of those individual pilots who chose not to participate in the settlement.

The term "LPP Claimants" has been subject to a common understanding among all parties to this litigation relating to the individuals comprising the group. Accordingly, we conclude that the LPP Claimants' notice of appeal sufficiently identifies the entity such that Continental, as well as this Court, is adequately apprised of the identity of the appellants such that appellate jurisdiction is proper. In so doing, we follow the Supreme Court's directive to construe Rule 3(c) liberally and to avoid a construction that would permit "mere technicalities" to bar the consideration of this case on the merits. Masquerade Novelty, 912 F.2d at 666 (quoting Dura Systems, 886 F.2d at 555).

B. Whether the Claimants' Appeals are Moot

Continental argues that the Claimants' appeals are moot, relying on ALPA's settlement of its LPP dispute with Continental. Essentially, Continental maintains that the claim settled by ALPA was a "group" claim. Thus, Continental argues, when ALPA settled the dispute, it settled the claim on behalf of the entire group on whose behalf it filed the bankruptcy claims, including the Group

of 31 and the LPP Claimants. According to Continental, then the relevant question is whether "if [individual rights to seniority integration arbitration under the LPPs] existed at all, [those] rights survived ALPA's settlement of the group grievance." In the district court, Continental challenged the LPP Claimants' individual standing under the LPPs to prosecute their rights to seniority integration. The district court declined to consider the merits of this argument, explaining that the issue constituted a "minor" dispute under the Railway Labor Act, 45 U.S.C. SS 151-163, and was subject to the jurisdiction of the arbitrator. We conclude that because the Claimants' individual rights to prosecute their claims for seniority integration have not

15

been established under the LPPs, we need not address whether the Claimants' individual rights to seniority integration survived ALPA's settlement of the dispute.

The right to seniority integration under the LPPs turns on whether a "merger" between Eastern and Continental occurred within the meaning of the LPPs. This determination depends on the meaning, interpretation and proper application of the LPPs. In turn, the issue of standing to maintain an individual claim for seniority integration under the LPPs is a "minor" dispute under the Railway Labor Act, 45 U.S.C. SS 151-163. See Consolidated Rail v. Labor Executives, 491 U.S. 299, 302 (1989) ("major disputes seek to create contractual rights, minor disputes to enforce them") (quoting Elgin, J & E. Ry. Co. v. Burley, 325 U.S. 711, 723, 65 S. Ct. 1282, 1289-90, 89 L.Ed. 1886 (1945) (minor disputes are those relating either to the meaning or proper application of a particular provision with reference to a specific situation)); Chicago & Northwestern Transp. v. Local Union 214, 829 F.2d 1424, 1427 (7th Cir. 1987). Accordingly, the issue of standing is subject to the exclusive jurisdiction of the arbitrator, and the district court properly concluded that its role relating to this issue was to protect the jurisdiction of the arbitration board. Consolidated Rail, 491 U.S. at 304 ("the[National Railroad Adjustment] Board . . . has exclusive jurisdiction over minor disputes. Judicial review of the arbitral decision is limited."); Chicago & Northwestern Transp., 829 F.2d at 1428.

Consistent with the federal courts' role relating to minor disputes, i.e., to protect the jurisdiction of the arbitration board, federal courts cannot inquire into the merits of an underlying dispute except to the extent necessary to determine its proper characterization as minor or major. Chicago & Northwestern Transp., 829 F.2d at 1428. Nor

may the courts decide what remedy is appropriate if the agreement is interpreted to require recovery of a remedy. General Com of Adj., United Transp. Union v. CSX R.R., 893 F.2d 584, 592-93 (3d Cir. 1990). Thus, the district court properly concluded that it could not consider the merits of Continental's argument that the Claimants did not have standing under the LPPs. As the Claimants' right to

prosecute their claims for seniority integration have not been established under the LPPs, we find that we need not address Continental's argument that their individual rights did not survive ALPA's settlement of the LPP dispute.

C. Merits of the Appeal

1. Bankruptcy Court's Jurisdiction

Before we determine whether the bankruptcy court properly determined the status of the Claimants' claims, we must address the Claimants' contention that the bankruptcy court did not have jurisdiction over the matter. The Claimants maintain that because the LPP dispute arose wholly outside the bankruptcy context, the matter is a "non-core" dispute over which the bankruptcy court did not have jurisdiction. The flaw in the Claimants' argument is that they confuse the disposition of the merits of the underlying LPP dispute with the treatment of their claims in bankruptcy. The bankruptcy court had exclusive jurisdiction over the latter.

A bankruptcy court has jurisdiction over all "core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. S 157(b)(1) (1993); In re Wood, 825 F.2d 90, 95 (5th Cir. 1987). Section 157(b) does not define "core proceedings." However, the phrase has been interpreted to apply to those rights that are created by federal bankruptcy law:

> If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding . . . If the proceeding is one that would arise only in bankruptcy, it is also a core proceeding; for example, the filing of a proof of claim or an objection to the discharge of a particular debt.

In re Wood, 825 F.2d at 97. See Beard v. Braunstein, 914 F.2d 434 (3d Cir. 1990) (acknowledging the standard for "core proceedings" articulated in Wood).

There can be no dispute that the issue as to whether the

bankruptcy claim could be satisfied by a monetary award is a "core bankruptcy matter." By filing a proof of claim against Continental's estate in bankruptcy court, the Claimants "invoke[d] the special rules of bankruptcy

17

concerning objections to the claim, [and] estimation of the claim." Wood, 825 F.2d at 97. Further, the issue decided by the bankruptcy court was how the claim would be treated in bankruptcy. Thus, the bankruptcy court was well within its authority to exercise jurisdiction over the issue of the status of the bankruptcy claim. Our conclusion is consistent with principles that govern the disposition of issues when bankruptcy law and labor law intersect. See L.O. Koven & Brothers, Inc. v. Local Union No. 5767, 381 F.2d 196, 205 (3d Cir. 1966) ("Questions involving an interpretation of the Bankruptcy Act should be decided by the court, while questions involving an interpretation of the collective bargaining agreement should if feasible be decided by the arbitrator."); see also Garland Coal & Mining Co. v. United Mine Workers, 778 F.2d 1297, 1304 (8th Cir. 1985) ("Once the arbitrator has decided the liability issue, the case should be returned to the bankruptcy court to decide the questions of allowability and priority of claims."). Accordingly, we conclude that the bankruptcy court had jurisdiction to determine whether the Claimants' claims could be satisfied by a monetary award in lieu of specific performance.8

_____

8. For the same reasons, we reject the Group of 31's efforts to invoke the Norris-LaGuardia Act, 29 U.S.C. S 101, et seq., to implicate the bankruptcy court's jurisdiction to determine how the claims will be treated in bankruptcy. Section 1 of the Norris-LaGuardia Act provides:

> No court of the United States as defined in this chapter, shall have
> jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

29 U.S.C. S 101.

The Group of 31 contends that despite the district court's order vacating the injunction the ruling that the remedy in arbitration can be "reduced" from full seniority integration to a claim for front pay "is as clearly an injunction and interference with the Kasher arbitration as was the bankruptcy court's blanket injunction against the continuation of the

arbitration." The conversion of the equitable remedy to front pay, upon successful challenge at the arbitration proceedings, only affects the

2. Whether the Equitable Remedy Constitutes a Claim
   Under the Bankruptcy Code

The LPP Claimants' and the Group of 31's primary contention on appeal is that the right to the equitable remedy of seniority integration under the LPPs cannot be converted into a claim for money damages. The Claimants emphasize that they seek specific performance under the LPPs, and they vehemently argue that the payment of money damages is not a viable alternative to the equitable right to seniority integration.

The district court rejected the Claimants' argument, holding that seniority integration under the LPPs gave rise to a "right of payment" within the definition of a "claim" under the bankruptcy code. In support of its conclusion, the district court further determined that money damages are a viable alternative to seniority integration.

The bankruptcy code defines "claim" as

> (B) right to an equitable remedy for breach of
> performance if such breach gives rise to a right to

_____

administration of the claim in bankruptcy. It does not operate to enjoin the arbitrator, nor does it dictate any particular remedy. Cf. Lukens, 989 F.2d at 677 (order directing an arbitrator not to preside over any newly ordered arbitration and deeming prior arbitration ineffectual involved operated as an injunction). Thus, we will not disturb the bankruptcy court's exercise of jurisdiction over the matter.

Similarly we reject the Claimants' argument that the determination whether the equitable remedy can be converted to a payment of money damages is inconsistent with the district court's conclusion that the individual right to seniority integration under the LPPs involves a "minor" dispute, subject to the exclusive jurisdiction of the arbitrator. See discussion, supra Part II.B. We discern no inconsistency between the bankruptcy court's exercise of jurisdiction to determine the status of the bankruptcy claim and the district court's characterization of the issue of the Claimants' standing under the LPPs as a "minor" dispute. The bankruptcy court's ruling related only to the manner in which the Claimants' claims in bankruptcy would be treated if a right to seniority integration is established. This ruling, unlike the standing issue, does not turn on an interpretation of the LPPs. Thus, the bankruptcy court's determination of the status of the claims and the district court's refusal to consider the merits of the standing issue was not inconsistent.

> payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. S 101(5). The term "claim" as defined in the bankruptcy code is construed broadly to permit debtors to meet all of their legal obligations in bankruptcy and to enable holders of claims to participate in the bankruptcy proceedings. See Ohio v. Kovacs, 469 U.S. 274, 279, 83 L.Ed.2d 649, 105 S. Ct. 705 (1985) ("Congress desired a broad definition of claim."); see, e.g., Pennsylvania Dep't of Public Welfare v. Davenport, 495 U.S. 552, 558 (1990) (debtors' obligation to pay restitution as a condition of probation which arose out of a criminal conviction for welfare fraud constituted a "debt" within the meaning of the bankruptcy code that gave rise to a "claim" under the code).

Under section 101(5), an equitable remedy can be deemed a "claim" if that remedy "gives rise to a right of payment." We are guided as to what constitutes a "right of payment" under the bankruptcy code by the Supreme Court's analysis in Ohio v. Kovacs. In Kovacs, the petitioner, the State of Ohio, obtained an injunction ordering the respondent, William Kovacs, to clean up a hazardous waste site. After Kovacs failed to comply with the injunction, the State obtained the appointment of a receiver, who was directed to take possession of all of Kovacs' assets and property and to clean up the waste site. Subsequent to the appointment of the receiver, Kovacs filed for bankruptcy. In response, the State filed a complaint in bankruptcy seeking a declaration that Kovacs' obligation under the injunction was not dischargeable in bankruptcy because it was not a liability on a "claim" under the bankruptcy code.

The Supreme Court held that the obligation imposed by the injunction had been converted to an obligation to pay money that was dischargeable in bankruptcy. Kovacs, 469 U.S. at 283. Critical to the Court's conclusion was its determination that the appointment of a receiver had dispossessed Kovacs of the property and therefore, had removed Kovacs' ability to cooperate with the receiver and

remove the waste from the site in compliance with the

injunction. Specifically, the Court stated:

> The injunction surely obliged Kovacs to clean up the site. But when he failed to do so, rather than prosecute Kovacs under the environmental laws or bring civil or criminal contempt proceedings, the State secured the appointment of a receiver, who was ordered to take possession of all of Kovacs' nonexempt assets . . . and to comply with the injunction . . . . As wise as this course may have been, it dispossessed Kovacs, removed his authority over the site, and divested him of assets that might have been used by him to clean up the property . . . Although Kovacs had been ordered to "cooperate" with the receiver, he was disabled by the receivership from personally taking charge of and carrying out the removal of wastes from the property. What the receiver wanted from Kovacs after bankruptcy was the money to defray cleanup costs . ..  Had Kovacs furnished the necessary funds, either before or after bankruptcy, there seems little doubt that the receiver and the State would have been satisfied.

Id. at 283. Thus, the Court concluded that under the circumstances, the clean up order had been converted into an obligation to pay money. Id. at 283.

In In re Torwico Electronics, Inc., 8 F.3d 146 (3d Cir. 1993), we addressed the issue whether a regulatory obligation directing a Chapter 11 debtor to develop a plan to ameliorate an ongoing environmental hazard could be converted into a "claim" in bankruptcy. In that case, Torwico Electronics, a manufacturing business, filed for Chapter 11 bankruptcy and listed the New Jersey Department of Environmental Protection and Energy (the "Department") as a creditor with a disputed and unliquidated claim. After Torwico filed its petition for bankruptcy, the Department performed an on-site inspection of Torwico's property and found hazardous waste, for which it issued a notice of violation to Torwico. Two months later, the deadline for filing proofs of claim in Torwico's bankruptcy case passed. The Department had failed to file any proof of claim by this deadline.

The Department, seeking to enforce Torwico's obligation under state and federal environmental laws, issued an Administrative Order requiring Torwico to submit a written closure plan for the hazardous site and assessing a monetary penalty for failure to take action under the earlier notice of violation. The Order specifically stated: "All

obligations are imposed pursuant to the police powers of the State of New Jersey, intended to protect the public health, safety, welfare, and environment."

In bankruptcy court, both parties sought summary judgment. Torwico maintained that the obligation constituted a "claim" under the bankruptcy code and that the State's failure to file a timely proof of claim was fatal to the State's position that Torwico was responsible for the obligation. The State, however, argued that the claims involved were regulatory obligations, not bankruptcy claims, and that Torwico was obligated to remedy the violations addressed in the Order pursuant to state and federal law.

Turning our attention to the Supreme Court's analysis in Kovacs, we explicitly noted that this case was unlike Kovacs in that the State was not demanding that Torwico pay money to it, but rather was requesting it to take action to ameliorate an ongoing hazard. Torwico Electronics, 8 F.3d at 150. Next, we shifted our focus to the nature of the obligation imposed by the Order and concluded that it was not an order for breach of an obligation that gave rise to the right of payment. Specifically, we noted:

> The state here found that the seepage pit was a continuing problem that was leaking hazardous material into the surrounding environment. Thus, the state is not asserting a "repackaged claim for damages"; rather there is an ongoing and continuing threat and . . . an obligation on the part of the debtor to "ameliorate ongoing pollution emanating from accumulated wastes" . . . The state has no "right to payment" here. What it has is a right to force the debtor to comply with applicable environmental laws by remedying an existing hazard.

22

Id. (quoting In re Chateauguay, 944 F.2d 997, 1008 (2d Cir. 1991)).9

Kovacs indicates, and Torwico Electronics implies, that a right of payment under the bankruptcy code is, essentially, an obligation to pay money. Thus, the issue we must decide is whether monetary payment is an alternative for the equitable remedy of seniority integration. See Matter of Udell, 18 F.3d 403, 407 (7th Cir. 1994) ("[an] example of a `claim' is a right to an equitable remedy that can be satisfied by an `alternative' right to payment"). The district court answered this question affirmatively, and we agree.

We begin our analysis by noting that here, when ALPA filed its proof of claim in bankruptcy court, it enumerated the claim as one for money damages, in addition to specific performance, arising out of the underlying LPP labor arbitration dispute. Indeed, in its supplemental pre-hearing statement filed at the arbitration, ALPA specifically noted that it sought "damages in the form of back pay and front pay against . . . Continental . . . in addition to integrated pilot positions." This is not the end of our inquiry, however. Consistent with the analyses in Kovacs and Torwico Electronics, we are compelled to examine the nature of the remedy sought and to ascertain whether it can give rise to a right of payment. We conclude that it does.

Unlike the obligation at issue in Torwico Electronics, seniority integration is not a remedy tailored to enforce compliance with any federal or state laws or regulations.

_____

9. In Torwico Electronics, we were persuaded by, and explicitly applied, the approach adopted by the Court of Appeals for the Second Circuit in In re Chateauguay, 944 F.2d 997 (2d Cir. 1990). In that case, the court addressed the issue of what constituted a claim in the context of the bankruptcy of an entity that operated hazardous waste sites. There, the court stated:

> Where an order imposes obligations distinct from any obligation to stop or ameliorate ongoing pollution, the order presents a claim if the government could have done the work itself and then sought reimbursement; under such circumstances there is a breach of an obligation that gives rise to a right of payment.

In re Chateauguay, 944 F.2d at 1008.

The source of the remedy is a provision contained in an agreement. By its contractual nature, it is clear that the remedy was not created to enforce compliance with any particular mandate. Rather, by its terms, seniority integration is a discrete remedy, specifically created to protect a group of employees.10 Thus, the remedy is a vehicle by which to provide a benefit or compensation to individuals who are covered by the explicit terms of the agreement and who, by the agreement's terms, are entitled to enforce the remedy.

Although the collective bargaining agreement is silent as to the remedy following a breach of the agreement, it is reasonable to conclude that a "corollary right to payment of liquidated damages" would flow from a breach giving rise to the equitable remedy under the LPPs. See Matter of Udell,

18 F.3d at 408 (holding that a right to an equitable remedy for breach of performance is a claim if the same breach also gives rise to a right of payment with respect to the equitable remedy or if the right to payment is an alternative to the right to an equitable remedy). See generally Chauffeurs, Teamsters, Etc. v. Terry, 494 U.S. 558, 108 L.Ed.2d 519, 110 S. Ct. 1339 (1990) (claim based on breach of a collective bargaining agreement is comparable to a breach of contract claim for which a legal award of money damages in the form of back pay is permitted); Stewart v. KHD Deutz of America Corp., 75 F.2d 1522 (11th Cir. 1996) (breach of [collective bargaining claim] claim is most analogous to a claim for breach of contract). The Court of Appeals for the Ninth Circuit's opinion in Van Waters & Rogers, Inc. v. Int'l Brotherhood of Teamsters, 913 F.2d 736 (9th Cir. 1990), is instructive.

In that case, the court upheld an award of monetary damages for breach of a contract mandating seniority integration. There, Van Waters, a seller and distributor of

_____

10. The LPPs specifically state:

> Section 1. The fundamental scope and purpose of the conditions hereinafter specified are to provide for compensatory allowances to employees who may be affected by [a] proposed merger . . . .

(Labor Protective Provisions, section 1).

24

chemicals, purchased its competitor, McKesson. Pursuant to the acquisition, Van Waters agreed to assume the terms and conditions of a collective bargaining agreement that existed between McKesson and its employees' union, Local 70. Although the collective bargaining agreement contained a seniority integration clause triggered by a purchase or sale of McKesson, Van Waters refused to honor the terms of the clause after the purchase was complete. Accordingly, Local 70 filed a grievance based on Van Waters' failure to integrate the seniority of the former McKesson employees with Van Waters' seniority list.

Arbitration of the dispute was complicated by two additional factors. First, Van Waters maintained a collective bargaining agreement with another union, Local 287. Second, the collective bargaining agreement between Local 70 and McKesson/Van Waters contained a clause precluding the arbitrator from determining any jurisdictional dispute arising between Local 70 and any other union. The effect of the latter factor was that any

ruling on a jurisdictional dispute would be outside of the scope of the arbitrator's authority. As seniority integration of Local 70's employees would affect the seniority of Van Waters' employees and create a potential conflict between the two unions, resolution of the dispute implicated the arbitrator's authority to resolve the dispute.

At the arbitration hearing, the arbitrator granted Local 70's grievance demanding that the seniority of the former McKesson employees be considered as integrated. However, the arbitrator declined to enforce seniority integration to avoid any jurisdictional dispute. Instead, the arbitrator ruled that the employees would receive damages for any wages and other benefits lost due to Van Waters' failure to consider their seniority. In so ruling, the arbitrator noted that the Local 70 agreement contained a provision that permitted the recovery of damages by employees arising out of an employer's failure to require a purchaser to assume the obligations of the collective bargaining agreement. The Ninth Circuit upheld the arbitrator's award, concluding that the arbitrator properly fashioned a monetary award to the former McKesson employees "for the breach of the terms of Local 70's collective bargaining agreement." Id. at 742.

25

Van Waters illustrates that a monetary damage award can be enforced as an alternative to, or can arise with respect to, the equitable remedy of seniority integration. The award is not cumulative, nor does it address a separate remedial concern. Rather, it serves as a substitute for the performance of an equitable remedy that cannot otherwise be enforced. See Van Waters, 913 F.2d at 741 ("if violated, [the seniority rights provided under the collective bargaining agreement] could be remedied by an award of damages rather than specific performance.").

We find support for the proposition that monetary awards are a viable alternative to the equitable remedy of seniority integration in wrongful discharge cases where we have enforced awards of monetary damages in lieu of reinstatement. Much like reinstatement, seniority integration is a "make whole" remedy, the purpose of which is to restore the employee to the economic status quo that would exist but for the employer's conduct. See Franks v. Bowman Trans. Co., 424 U.S. 747, 766 (1976).

Although we have recognized that reinstatement is the preferred remedy to address cases of wrongful discharge, we have enforced monetary awards as a viable alternative where reinstatement is impractical. See Maxfield v. Sinclair International, 766 F.2d 788 (3d Cir. 1985) (front pay is an

appropriate alternative to reinstatement where the relationship between the parties may be so damaged by animosity that reinstatement is impracticable and the remedial purposes of the statute would be frustrated if front pay were not available as an alternative remedy); Goss v. Exxon Office Systems Co., 747 F.2d 885 (3d Cir. 1984) (same); see also Ellis v. Ringgold School District, 832 F.2d 27 (3d Cir. 1987) (reinstatement may be denied when animosity between the parties makes such remedy impracticable). Cf. Squires v. Bonser, 54 F.3d 168 (3d Cir. 1994) (special circumstances indicating that tensions between the parties exceed those which normally accompany reinstatement or indicating "irreparable" animosity among the parties involved justifies denial of reinstatement).11 Similar to the conditions that can result

---

11. Squires is distinguishable. That case involved an employee who challenged the district court's failure to direct reinstatement to his

26

from the enforcement of reinstatement, disruption to the work environment, irreparable damage to work relationships, and hostility and animosity are all very probable conditions that can result from the enforcement of seniority integration. Considering the similarity in purpose between the two remedies, the rationale underlying the enforcement of an alternative remedy to fulfill their remedial purposes, and the similarity in the impracticality of enforcing the remedies under particular circumstances, we are certain that a money damage award is an appropriate alternative to seniority integration.

Moreover, we are convinced that the particular circumstances of this case might make the enforcement of the equitable remedy of seniority integration impractical such that an alternative money damage award would be appropriate. The seniority integration sought by the LPP Claimants and the Group of 31 could potentially result in the displacement of many Continental pilots. Such displacement has the potential to create an environment rife with hostility and low employee morale, not to mention a detrimental effect on employer-employee relations. 12 The

---

former position after a jury sustained a First Amendment constitutional challenge to his employer's failure to reappoint him. Reversing the district court's decision not to reinstate the employee, we stated, "[t]he fact that reinstatement might have disturbing consequences, revive old antagonisms, or breed difficult working conditions usually is not enough to outweigh the important first amendment policies that reinstatement

serves [absent] probable adverse consequences[that] weigh so heavily that they counsel the court against imposing this preferred remedy." Squires, 54 F.3d at 175 (quoting Banks v. Burkich, 788 F.2d 1161, 1165 (6th Cir. 1988)). Thus, it is clear that our decision to remand with instructions to reinstate the appellant was driven by the constitutional nature of the claims and the compelling need to enforce reinstatement to remedy the violation. As the claims here do not involve constitutional concerns, we cannot conclude that any remedy short of seniority integration will not suffice to remedy the alleged violation.

12. We note that nothing about the imposition of monetary damages as a substitute for seniority integration frustrates the remedial purpose of the LPPs. Cf. Franks, 424 U.S. at 771 (in a Title VII case, "the denial of seniority relief to victims of illegal racial discrimination in hiring is permissible `only for reasons which, if applied generally, would not

circumstances indicate that seniority integration would not be a feasible remedy and that an alternative remedy of monetary damages would be appropriate. Therefore, we conclude that the right to seniority integration gives rise to a "right of payment" such that the remedy constitutes a "claim" dischargeable in bankruptcy.

We take care to note the boundaries of our holding. It is not our purpose to suggest the award the arbitrator should grant, if an award is warranted upon disposition of the LPP dispute. Our holding is limited to how the claims should be treated in bankruptcy. Simply put, we hold that any claim based on an award of seniority integration arising out of the resolution of the LPP dispute will be treated as a claim in bankruptcy giving rise to a right of payment. As such, the right to seniority integration is satisfiable by the payment of money damages.

D. Arguments of Appellee/Cross-Appellant Continental

1. Dissolution of the Injunction

Continental challenges the district court's ruling vacating the injunction against the continuation of the Kasher Arbitration on two grounds. First, it argues that contrary to the district court's conclusion, the permanent injunction, imposed by the Plan of Confirmation, complied with the mandate of Rule 65(d).13 Next, it contends that if the

_____

frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.' "). Indeed, the LPPs set forth as its scope and purpose "to provide for compensatory allowances to employees who

may be affected by the proposed merger of " the carriers. See discussion supra note 2. An award of monetary damages is consistent with the articulated scope and purpose, and is therefore appropriate.

13. Section 12.19 of the plan of reorganization provided:

> 12.19 Injunction Relating to Eastern Claims . This Joint Plan permanently enjoins, and the Confirmation Order shall constitute and provide for a permanent injunction against, any Person or entity, including without limitation, (i) any present or former employee of Eastern . . . (ii) any labor union or collective bargaining representative acting or purporting to act on behalf of any such

28

permanent injunction did not comply with Rule 65(d), the statutory injunction referenced in the bankruptcy court's confirmation order survived the permanent injunction and is valid. We need not decide whether the permanent injunction failed to comply with the mandate of Rule 65(d). We conclude that even assuming that the statutory injunction survived the permanent injunction and is not subject to the requirements set forth in Rule 65(d), Continental's failure to reject the collective bargaining agreement consistent with the mandate of section 1113 of the Code renders the injunction invalid.

The Confirmation Order issued by the bankruptcy court specifically incorporated the statutory injunction prescribed by the bankruptcy code. The order states:

> In accordance with section 524 of the Bankruptcy Code . . . this Order:

> (ii) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt or Claim as a personal liability of the Debtors . . . .

(Findings of Fact, Conclusions of Law and Order Confirming The Debtors' Revised Second Amended Joint Plan of Reorganization).

_____

> employees or former employees . . . from commencing, conducting or continuing any suit, arbitration, action or other proceeding in any place or forum against any Debtor, . . . This injunction shall apply, without limitation, to any suit, arbitration, action or proceeding.

(Debtors' Revised Second Amended Joint Plan of Reorganization, S 12.19).

Federal Rule of Civil Procedure 65(d) states:

> Every order granting an injunction and every restraining order shall
> set forth the reasons for its issuance; shall be specific in terms;
> shall describe in reasonable detail, and not by reference to the
> complaint or other document, the act or acts sought to be
> restrained. . . .

Fed.R.Civ.P. 65(d).

Assuming, as the district court did and as Continental argues, that the section 524 statutory injunction is not subject to the requirements of Rule 65(d), we conclude that the district court properly vacated the injunction against the Kasher Arbitration. Section 1113 of the Code provides:

> (a) The debtor in possession, or the trustee if one has
> been appointed under the provisions of this chapter
> . . . may assume or reject a collective bargaining
> agreement only in accordance with the provisions of
> this section.

11 U.S.C. S 1113(a). The provision outlines the procedure that a debtor or appointed trustee must follow to successfully reject a collective bargaining agreement, including, but not limited to: (1) the submission of a proposal to an authorized representative of the employees affected by the terms of the agreement prior to thefiling of an application to reject the agreement, 11 U.S.C. S 524(b)(1)(A); and (2) good faith attempts to reach a "mutually satisfactory modification" of the agreement, 11 U.S.C. S 524(b)(2).

The intent behind section 1113 is to preclude debtors or trustees in bankruptcy from unilaterally terminating, altering, or modifying the terms of a collective bargaining agreement without following its strict mandate. In re Ionosphere, 922 F.2d at 989-90. Moreover, the provision operates to preclude the application of other bankruptcy code provisions to the advantage of debtors and trustees to permit them to escape the terms of a collective bargaining agreement without complying with the requirements of section 1113. See id.

Continental does not dispute that it did not follow the requirements set forth in section 1113 to reject the

collective bargaining agreement. Instead, Continental suggests that the imposition of the injunction was consistent with the bankruptcy court's authority to determine the administrative priority and status of the bankruptcy claims. Thus, it argues, section 1113 cannot

divest the bankruptcy court of jurisdiction to exercise this authority and impose the injunction. We disagree. 14

The injunction allowed Continental to avoid its obligation to arbitrate the merger dispute under the LPPs. In In re Ionosphere, the Court specifically held that the application of the section 362 automatic stay provision to effectuate this result in the absence of the debtor's compliance with the requirements of section 1113 was impermissible, as "its application would allow a debtor unilaterally to avoid its obligation to arbitrate." In re Ionosphere, 922 F.2d at 993. Here, the enforcement of the statutory injunction in the face of Continental's failure to follow the requirements of section 1113 is no different. As the enforcement of the injunction would have the effect of permitting Continental to escape its duty to arbitrate under the collective bargaining agreement, we decline to enforce the statutory injunction in the absence of Continental's compliance with the requirements to reject the collective bargaining agreement.15

2. Duty to Arbitrate

Finally, we reject Continental's argument that it has no duty to arbitrate the LPP dispute. Throughout this litigation, Continental has premised its arguments on the

_____

14. We have not been required previously to address the applicability of arbitration under collective bargaining agreements when the employer is in bankruptcy, although the issue was raised in a case we decided last year. See Antol v. Esposto, 100 F.3d 1111, 1121 n.4 (3d Cir. 1996) ("[W]e need not decide that interesting issue here."). This case, however, requires us to do so.

15. Despite our conclusion that failure to comply with section 1113 bars an injunction of the arbitration, we reject the Claimants' contention that the substitution of a monetary damage award, in lieu of seniority integration, is not permitted under section 1113 because it alters or modifies the terms of the collective bargaining agreement. The bankruptcy court's determination of the administrative priority and status of the claims was not based on an interpretation of the LPPs. Nor did it predetermine the appropriate remedy warranted under the LPPs, thus "nullifying" the agreement and infringing on the arbitrator's

jurisdiction. Substitution of the equitable remedy in no way amounts to an alteration or termination of the terms of the collective bargaining agreement.

31

assumption that it is bound by the LPPs and has a duty to arbitrate the LPP dispute. In so doing, Continental reaped enormous benefits: (1) it was able to obtain a ruling that the claim based on seniority integration could be treated as a right to payment in bankruptcy, satisfiable by a monetary award; and (2) in turn, it received backing from investors for its plan of reorganization, which was critical to plan confirmation by the bankruptcy court.16  Now, Continental maintains that there has been no determination that it is bound by the LPPs and that the case should be remanded to the district court for a determination on the merits of its duty to arbitrate the dispute.

In light of the overwhelming advantage that Continental derived from maintaining the position that it was bound by the collective bargaining agreement, and thus, had a duty to arbitrate the LPP dispute, we refuse to allow Continental to repudiate that representation and return to the district court to litigate the issue whether it is bound by the agreement. See EF Operating Corp. v. American Bldgs., 993 F.2d 1046, 1050 (3d Cir. 1993) ("one cannot casually cast aside representations, oral or written, in the course of litigation simply because it is convenient to do so . . . a reviewing court may properly consider the representations

_____

16. It is apparent that Continental assumed this position in efforts to obtain judicial confirmation of its plan of reorganization. In its Motion for
Partial Summary Judgment, Continental stated:

        1. [Debtors] make this Motion For Partial Summary Judgment On
        Their Partial Objection to Claims Based On Certain Alleged Labor
        Protective Provisions Involving The Air Line Pilots Association,
        International ("ALPA") And Eastern Air Lines, Inc. ("Eastern") in
        order to ensure that they will be able to reorganize successfully
and,
        more specifically, to satisfy a condition of the Investment
Agreement
        dated November 9, 1992 ("Investment Agreement"), by and among
        [the investors] and the Debtors. In addition to monetary damages,
        these claims seek to require Continental to hire several thousand
        Eastern Air Lines pilots, which if granted would necessitate the
        displacement of an equal number of incumbent Continental pilots.
        Debtors seek in this Motion a legal determination that the "LPP
        Claims" . . . are, at best, dischargeable, prepetition general

unsecured claims within the meaning of the Bankruptcy Code
Section 101(5).

32

made in the appellate brief to be binding as a form of
judicial estoppel, and decline to address a new legal
argument based on a later repudiation of those
representations."). Accordingly, we conclude that
Continental is bound by its prior representations that it has
a duty to arbitrate the LPP dispute.

III.

For the foregoing reasons, we affirm the district court's
decision in all respects.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

33