**In re DEVOS, INC. d/b/a Diamond Meat and Food Service Company, Debtor.**

**Parkway Provision Company, Plaintiff,**

**v.**

**The Bankruptcy Estate of Devos, Inc. t/d/b/a Diamond Meat and Food Service Company, Defendant,**

**Devos, Inc. d/b/a Diamond Meat and Food Service Company, Plaintiff,**

**v.**

**Parkway Provision Company d/b/a Diamond Meat and Food Service Company, Inc. and David L. Reese, an Individual, Defendants.**

Bankruptcy No. 00–20698.
Adversary Nos. 00–2593, 00–2664.

United States Bankruptcy Court, W.D. Pennsylvania.

May 27, 2004.

John R. Orie, Jr., Robert O. Lampl, Pittsburgh, PA, for Devos, Inc. t/d/b/a Diamond Meat and Food Service Company.

John C. Hansberry, Pittsburgh, PA, for Parkway Provision Company, Diamond Meat and Food Service Company, Inc. and David L. Reese.

## RECOMMENDATION TO DISTRICT COURT[1]

WARREN W. BENTZ, Bankruptcy Judge.

### Introduction

Devos, Inc. d/b/a Diamond Meat and Food Service Company ("Devos" or "Debtor") filed a voluntary Petition under Chapter 11 of the Bankruptcy Code on February 2, 2000. The disagreement between the parties involves the interpretation of the language of an AGREEMENT OF PURCHASE AND SALE OF ASSETS ("APA") dated August 19, 1997 between Devos as seller and Diamond Meat and Food Service Company, Inc. ("New Diamond" or "Buyer") as Purchaser and for amounts claimed due under a related Lease Agreement ("Lease") between De-

vos as Lessor and New Diamond as Lessee. New Diamond is a wholly-owned subsidiary of Parkway Provision Company ("Parkway"). The within Adversary Proceedings are substantially identical.

In Adversary Proceeding No. 00–2593, Parkway, as Plaintiff, asserts that it was damaged by the unlawful taking of its property by Devos. Parkway claims that it purchased from Devos and therefore owned certain refrigeration equipment, sinks and air curtains which it rightfully removed from the former Devos business location at 650 Mansfield Avenue, Greentree, PA (the "Building" or the "Premises"). Parkway asserts that before Parkway was able to remove its remaining purchased equipment from the Building, Devos sold the Building and equipment to a third party and was therefore unjustly enriched.

In Adversary Proceeding No. 00–2664, Devos, as Plaintiff, alleges that the refrigeration equipment, sinks and air curtains were not included in the sale to Parkway, and therefore the removal of these items by Parkway and David L. Reese ("Reese") was wrongful. Devos asserts that it owned any equipment that remained in the Building when it was sold. Devos further asserts a right to breach of contract damages from Parkway for its failure to pay rents and other charges due under the Lease.[2]

We conducted a three-day trial/evidentiary hearing on May 28, 29 and 30, 2003 on the Complaints and Counterclaims. Post-trial briefs have been filed and the matter is ripe for decision.

---

**1.** The within Recommendation constitutes this Court's proposed findings of fact and conclusions of law which are submitted to the District Court for de novo review in these non-core proceedings pursuant to 28 U.S.C. § 157(c)(1).

**2.** Devos does not alleged that Reese is liable for the Lease obligations.

## Jurisdiction

The parties appropriately agree that we have jurisdiction over Parkway's claims against Devos and Devos's claims against Parkway and New Diamond as non-core matters. *See Beard v. Braunstein*, 914 F.2d 434 (3rd Cir.1990). Under 28 U.S.C. § 157(c)(1), we are to submit proposed findings of fact and conclusions of law to the District Court. Reese disputes that the Court has jurisdiction over the claim against him.

■■■ "[T]he test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir.1984). "[T]he proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Id.*

The claims asserted by the Debtor against Reese, if valid, would have an effect on the estate and are related to the Debtor's bankruptcy case.

## Facts

### Background

The Devos family founded the Diamond Meat and Food Service Company in 1933. The operation was incorporated as Devos, Inc. d/b/a Diamond Meat Company in 1977. The business flourished. In 1992, Devos was selected to receive the coveted Certified Angus Beef designation as the distributor for the Pittsburgh market. By 1995 and 1996, Devos's revenues were approximately $24 million and a larger facility was needed. Devos purchased the Building, a former Borden Dairy facility, in 1995 for $1,275,000.

Borden had removed all equipment and piping from the Building. Before occupying the Building, Devos infused $2,000,000 to make it a state of the art food distribution facility which met United States Department of Agriculture ("USDA") specifications. Part of the expense was the installation of 15 new compressor/condenser units and 28 blower/evaporator units. The equipment cost $300,000 plus $120,000 for installation.

Shortly after moving into the Building, Devos began to experience financial problems when it lost two major customers and discovered an inventory shortage of over $1 million.

### Sale Negotiations

Reese formed Parkway in 1966. Parkway was a broad-line food distributor, selling a wide variety of items to the restaurant industry. Parkway had sales of approximately $100 million, four times those of Devos. Devos, by contrast, was a "center of the plate" food distributor, which concentrated its sales on the main entree served at restaurants. While Parkway and Devos had some mutual customers, Devos, partially due to having the Certified Angus Beef designation, enjoyed the business of certain upscale clientele that Parkway was unable to penetrate.

Reese had casual discussions with the majority shareholder of Devos, Vince Devos ("Vince") in the early 1990s about a purchase or merger. No deal was struck. In the fall of 1996, Reese heard that Devos was having financial problems. Reese initiated a meeting with Vince to determine whether Devos had any interest in a merger or sale. Parkway wanted to gain market share which it could do by penetrating

the "upscale" market that Devos enjoyed and by obtaining the Certified Angus Beef designation.

An initial meeting was held. The shareholders of Devos, Vince who owned 65% of the stock, and his two sons Steve ("Steve") and Louis ("Louis") who each held 15%, and William Jersey ("Jersey") the remaining 5% shareholder, attended the meeting with Reese, and Pete Perfetti ("Perfetti") who was the Chief Financial Officer of Parkway. Vince expressed an interest in exploring the possibilities.

Shortly thereafter, Vince, Steve, Louis, Jersey and Reese met at the Building to tour the Devos facility and those same individuals met shortly thereafter to tour Parkway's facility in Greensburg, Pennsylvania. Following the walk-through visits, negotiations for the sale and/or merger began. Vince and Jersey conducted the negotiations on behalf of Devos. Vince died on June 22, 1997 in the middle of the process. After his death, Jersey and Devos's attorney, Thomas Lutz ("Lutz"), conducted the negotiations. Steve and Louis were not involved and took no part in the negotiations for the sale. Their involvement was limited to the negotiation of their own employment agreements with the Buyer.

Louis first learned of the proposed purchase by Parkway upon receipt of Parkway's letter of intent addressed to him dated July 1, 1997 ("Letter of Intent"). The Letter of Intent outlined the terms under which Parkway, or its assignee, agreed to purchase Devos, lease the Building for two years, and provide employment to Louis, Steve and Jersey. The Letter of Intent was subject to the negotiation of the formal agreement. Louis, Steve and Jersey executed the Letter of Intent as officers of Devos on July 8, 1997.

*Asset Purchase Agreement*

The APA bears a date of August 19, 1997. It is an agreement between Devos and New Diamond for the sale of Devos's assets to New Diamond. New Diamond was formed as a new corporation on August 18, 1997 as a wholly-owned subsidiary of Parkway for the acquisition of Devos. Parkway loaned New Diamond $1,751,294.25 to complete the purchase and took back a Promissory Note and Security Agreement in essentially all of New Diamond's assets. The purchase price was $150,000 for all assets other than inventory, plus a fixed formula for the inventory.

Negotiations leading up to the closing date of August 27, 1997 were conducted by Jersey and Lutz for Devos and Reese and Attorney John Barson ("Barson") for Parkway/New Diamond. Louis and Steve first reviewed the APA at the closing.

Section 1.01(a) of the APA provides that New Diamond is purchasing:

all right, title and interest in and to all of those assets, properties, rights and businesses of any kind, character and description, tangible, intangible, real, personal or mixed, known or unknown, choate or inchoate, accrued, absolute, contingent or otherwise, which are used in, associated with or located at the Business, except for the "Excluded Assets" as defined in Section 1.01(b) hereof, (collectively, the "Assets") . . .

Section 1.01(a) further identifies certain of the Assets that New Diamond is purchasing:

. . .

the Assets shall include, but shall not be limited to, all right, title and interest in and to the following:

. . .

(ii) all machinery, equipment, vehicles, fixtures, furniture, tools, molds, leasehold improvements and other tangible

property (the "Equipment") including the items set forth on Schedule 1.01(a)(ii) hereto;

. . .

(vii) all . . . computer software programs . . .

The Excluded Assets are identified in Section 1.01(b) and include "the land, building and improvements" and "those certain storage racks for which a financing statement has been filed of record granting Allegheny Bank of Pittsburgh a security interest therein."

Section 1.02 provides that the Assets purchased by New Diamond shall be free and clear of all encumbrances and that New Diamond "will not assume any liabilities or obligations of Seller . . . including, but not limited to, any liabilities to Seller's employees. . . ." In § 5.10, Seller agrees to pay, perform and disclose all of its liabilities and obligations.

Section 7.02 provides for the Purchaser to collect the Seller's accounts receivable and remit the proceeds to Seller or its lender.

As a condition precedent to closing, § 9.17 provides that the "Purchaser shall have received from Fleet Bank [and] Dollar Bank . . . (I) consents to the transactions contemplated hereby, and (ii) agreements to the termination of all security interests held in, or other rights to the Assets."

In § 10.01, "Seller agrees that Purchaser shall have no obligation to assume any liabilities, obligations or responsibilities relating to . . . any employees" of the Business.

Article XI provides mutual indemnification provisions. In § 11.01, Seller agrees to indemnify and hold Purchaser harmless from all claims resulting from Seller's business operation. In § 11.02, Purchaser agrees to indemnify and hold Seller harmless from all losses resulting from any breach of the APA. Section § 11.03 provides that "[t]he party entitled to indemnification . . . shall promptly, but in any event within twenty (20) days, give notice to the party obligated to indemnify . . . after it obtains knowledge of any claim. . . ."

A schedule of the equipment and supplies being transferred is attached to the APA. The list includes two (2) Bohn Compressors and such detail as the number of pens and pencils on hand. The APA was executed on August 19, 1997 by Louis, Steve and Jersey on behalf of Devos and by Reese on behalf of New Diamond.

The actual closing on the transaction was scheduled for a later date. In preparation for the closing, negotiations took place with Devos's lenders, Dollar Bank ("Dollar") and Fleet Bank ("Fleet") to obtain the release of the banks' security interests on the assets being sold.

Certain individuals representing both the Buyer and Seller met with Mr. James P. Wheeler ("Wheeler"), Vice President of corporate banking at Dollar.[3] Dollar held a mortgage on the Premises and a security interest in virtually all of Debtor's assets. The refrigeration equipment was discussed.

Following the sale, Dollar would continue to hold its mortgage on the Building. Dollar was concerned that removal of the freezer equipment would jeopardize the value of the Building. It therefore agreed to release its security interest in all of the refrigeration pumps or compressors associated with the refrigerated or cooling areas, but specifically refused to release its

---

**3.** Steve and Louis Devos were not present. Those in attendance were Reese, Attorney Lutz for Devos and perhaps Jersey.

security interest in those pumps, compressors and equipment related to or connected with the freezer.

Fleet agreed to allow the Buyer to collect Devos's accounts receivable on which it maintained a security interest and remit the proceeds to Fleet. Fleet released its collateral except as to certain enumerated items, including, among others, accounts receivable and "the land, building and improvements" located at the Building.

### Lease

At closing, Devos and New Diamond entered into the Lease by which New Diamond leased the Building for a period of two (2) years from September, 1997 through August, 1999. The monthly rental rate varied according to a schedule attached to the Lease. The monthly rental payment was paid one month in arrears with two (2) payments due in August, 1999, one on August 1 for the month of July and the other on August 31 for the month of August. As additional rent, New Diamond agreed to pay "the amount equal to any and all real estate taxes...during the Term [of the Lease]" and agreed to "be solely responsible for...all charges for heat, water, sewer rentals, gas, electricity or other utility used or consumed in the Premises."

Article 18 provides that if Lessee fails to pay any amounts due under the Lease or if the Lessee shall abandon or vacate the Premises, then Lessor may without further notice declare Lessee in default and proceed with the remedies provided for in Article 19 which include the right to cancel the "Lease at once and re-enter and take possession of the Premises immediately, without any previous notice of intention to re-enter."

### New Diamond Operations

New Diamond commenced operations out of the Devos's Building separate and apart from Parkway's operations. It employed Devos's employees, including Steve, Louis and Jersey. The intent was to look and act like Devos to maintain the customer base. Shipments to New Diamond customers were made in boxes marked with both the Diamond name and the Parkway name to slowly alert customers to the fact that Parkway and New Diamond were affiliated.

New Diamond operated at a loss. It was unable to meet its obligation to repay Parkway. Parkway "took over" New Diamond in mid–1998 and decided to close it. Steve and Louis were transferred to the Parkway facility in Greensburg, Pennsylvania (the "Parkway Facility").

By December, 1998, Parkway felt that the two entities could be totally combined to achieve economies of scale. The bulk of New Diamond's inventory and small equipment was transferred to the Parkway Facility over a weekend in December, 1998. This enabled the business to continue uninterrupted. Certain inventory items remained in the freezer of the Building and were removed to the Parkway Facility on an as-needed basis.

Steve and Louis engaged a realtor to place the Building on the market. They, along with their mother, had pledged personal assets as additional security to Dollar Bank, and without Lease payments coming in, they would be unable to meet their obligations unless the Building was sold.

Parkway continued to make rental payments through June, 1999. It did not make the payments due on July 1, August 1, and August 31 in the total amount of $75,866.08.

Property taxes on the Building for 1999 in the amount of $52,481 were paid by Devos at closing. Devos asserted but presented no evidence to prove that the lessee failed to pay for utilities used during its period of occupancy.

Parkway asserts that it did not pay the balance of amounts due under the Lease as it was entitled to a set-off for amounts that it paid which Devos owed for telephone, utilities, health insurance, and one month's sales tax.

### Removal of Refrigerator Equipment, Sinks and Air Curtains

Shortly after shutting down operations at the Building, the "executive board" [4] at Parkway met and determined that Parkway needed to add a produce cooler and a refrigerated dock. Parkway decided to remove the refrigeration equipment, sinks and air curtains from the Building for use at the Parkway Facility.[5]

Reese went to the Building and designated certain compressor condenser units and evaporators for removal, making sure to remove only refrigeration equipment associated with the cooling area and none of the units associated with the freezer.

Reese directed employees of Reese Associates, Inc. to do the physical removal.[6] Bolts holding the compressor/condenser units to the concrete pads were sawed off. Freon was siphoned from the lines and pallet jacks were used to load the 8 compressor/condenser units onto tractor/trailer trucks belonging to Reese Associates, Inc. and take them to the Parkway Facili-

ty. Parkway removed evaporator/blower units from inside the Building, in a similar fashion.

In addition to the refrigeration equipment, Parkway removed two sinks valued at $300 each and two air curtain doors valued at $1,000 each.

Certain metal racking is also missing from the Building. There is no evidence as to how it vanished or who may have taken it.

Steve discovered the removal of the items when he went to the Building with the real estate agent. He immediately called the police to report the equipment missing and contacted Debtor's attorney who, in turn, contacted the attorney for New Diamond/Parkway who took the position that the removed items were owned by Parkway and were rightfully removed and further asserted the right to return to the Building to remove the remaining refrigeration equipment.

### Bankruptcy Sale of Building

Five days after Devos filed its bankruptcy case, it filed a Motion for Approval of Sale of the Building. Parkway filed a Response in which it asserted ownership of the remainder of the refrigeration equipment and other personalty in the Building. At that time, Parkway asserted that it had an offer of $6,000–$10,000 for the remaining equipment depending on condition. Parkway asserted that it should be permitted to remove the property prior to a sale.

---

4. Reese met weekly with an "executive board" at Parkway. The V.P. of Sales, C.F.O., V.P. of Purchasing, V.P. of Operations and Reese comprise the board. Reese has veto power over the board's decisions.

5. The date is not clear, but the removal occurred before February 23, 1999, the date on which the attorney for Devos contacted the

attorney for New Diamond/Parkway about the removed equipment.

6. Reese Associates, Inc. is a sister corporation to Parkway. Reese Associates, Inc. did delivery, warehousing and some of the maintenance work for Parkway.

Parkway subsequently filed an Emergency Motion to Clarify its rights in connection with an order approving the sale. In support of the Emergency Motion, Parkway filed the Declaration by Reese in which he indicates that the value of $6,000–$10,000 represents scrap value and not fair market value.

At the sale hearing, the attorney for Debtors represented that the remaining equipment in the Building had a conservative value of $50,000 and might be worth as much as $100,000 if marketed for 12–18 months.

The Court entered an Order approving the sale of the Building and all of the contents for $2,355,000 on April 4, 2000. The Order provided for an escrow of $50,000 from the sale proceeds as a carve-out for the payment of claims, administrative costs and unsecured creditors.

### Accounts Receivable

The APA provided for New Diamond to collect Devos's accounts receivable and remit the amount collected to Fleet Bank. Debtor's accounts receivable records were included in computer software that was transferred as part of sale to New Diamond. New Diamond proceeded to collect the receivables and eventually integrated the Devos receivable information into the Parkway system.

Louis testified that at the time of closing, Fleet was owed $1.675 million. Louis estimated that Devos's receivable balance was $2.3 million. New Diamond and Parkway collected the receivables and paid Fleet all but $165,000 which was paid by the Devos family.

Devos did not receive a final accounting of the receivables collected and never requested the information from New Diamond or Parkway.

### Discussion

#### Parkway's Liability

■ Devos asserts that it is appropriate to pierce the corporate veil of New Diamond to hold Parkway liable as an alter ego.

■ "[T]here is no definitive test for piercing the corporate veil." *Plastipak Packaging, Inc. v. DePasquale*, 75 Fed. Appx. 86, 88 (3d Cir.2003) *quoting First Realvest, Inc. v. Avery Builders, Inc.*, 410 Pa.Super. 572, 600 A.2d 601, 604 (Pa.Super.1991). "Pennsylvania generally recognizes that the corporate veil may be pierced whenever necessary to avoid injustice." *Id. quoting Rinck v. Rinck*, 363 Pa.Super. 593, 526 A.2d 1221, 1223 (Pa.Super.1987).

When determining whether the facts of a particular case warrant piercing of the corporate veil based on an alter ego theory, a court should engage in a fact-specific inquiry in light of the following factors:

First is whether the corporation is grossly undercapitalized for its purposes. Other factors are . . . failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning funds of the corporation by the dominant officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Pisani*, 646 F.2d at 88 (quoting *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 686–87 (4th Cir.1976)). This list is not exhaustive, nor must all of the above factors be present to warrant a finding of alter ego liability. *American Bell, Inc.*, 736 F.2d at 886–87. Moreover, the Third Circuit has recognized that alter ego liability

may be premised on some "less precise notion that the [two distinct] corporations simply acted interchangeably and in disregard of their corporate separateness." *American Bell, Inc.*, 736 F.2d at 886–87 (quoting *Publicker Indus., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1070 (3d Cir.1979)). For example, the Third Circuit has found the alter ego liability may be appropriate where "the controlled corporation acted robot- or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons." *Culbreth v. Amosa (Pty) Ltd.*, 898 F.2d 13, 15 (3d Cir.1990) (considering alter ego liability under Pennsylvania and New Jersey law which require showing of "pervasive domination"). Thus, a court should impose alter ego liability where the facts of a case "present an element of injustice or fundamental unfairness." *Pisani*, 646 F.2d at 88.

*United Food and Commercial Workers Union v. Fleming Foods East, Inc.*, 105 F.Supp.2d 379, 388–89 (D.N.J.2000).

The same persons served as officers and directors of both Parkway and New Diamond. Since New Diamond was a wholly-owned subsidiary of Parkway, both corporations ultimately had the same owners.

New Diamond was grossly undercapitalized. It acquired the Devos assets pursuant to the APA with $1.75 million in funds borrowed from Parkway. New Diamond's net assets remained near zero because it had liability to Parkway for the borrowed funds.

New Diamond promptly began to suffer losses and defaulted on its agreement with its 100% shareholder and parent corporation, Parkway.

Parkway did not observe corporate formalities. Parkway "took" the assets of New Diamond. Parkway's executive board made the decision to move the New Diamond operation to Parkway's Greensburg facility. Funds were co-mingled. Parkway paid the rent on the Lease and also determined not to pay the final months of rent. Devos's accounts receivable were merged into Parkway's system for collection by Parkway.

Finally, it is fundamentally unfair and unjust to allow Parkway to take all of New Diamond's assets, continue to use the leased Building, inventory and equipment in the Building, pay rent and utilities under the Lease and then months later claim that it is not obligated for the remaining balance due under the Lease because Parkway did not sign the Lease.

The evidence is clear and convincing that New Diamond lacked capitalization, was merely the "puppet" or "robot" of Parkway and had no independent existence. Parkway and New Diamond are jointly and severally obligated for the Lease obligations.

### Reese Liability

■ Devos asserts that "Reese is personally liable for conversion because he directed the theft of the improvements." We find no evidence of "theft of the improvements" and no evidence that Reese acted in any capacity outside the scope of his duties as a director and officer of New Diamond and Parkway.

Devos's Complaint against Reese should be dismissed.

### Refrigeration Equipment, Sinks and Air Curtains

■ The parties dispute whether the language of the APA provides for the inclusion of the refrigeration equipment, sinks and air curtains in the sale. Both parties assert that the APA is clear and unambiguous on its face, and yet the par-

ties proffer two dissimilar interpretations of its terms.

The APA and related documents executed at the closing do not specifically mention the refrigeration equipment, sinks or air curtains.

New Diamond directs our attention to § 1.01(a) which provides that all assets of any kind including all machinery, equipment and fixtures are included in the sale. New Diamond further posits that the refrigeration equipment was specifically negotiated for inclusion in the sale and that the Assets were included in the sale as "fixtures" utilized in the business.

Devos posits that the refrigeration equipment, sinks and air curtains are "improvements" that are specifically excluded from the sale by § 1.01(b) which provides that "the land, building and improvements" are excluded from the sale.

The Pennsylvania Supreme Court has defined an improvement as:

> [a] valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes...

*McCormick v. Columbus Conveyer Co.,* 522 Pa. 520, 564 A.2d 907, 909 (1989) (quoting *Black's Law Dictionary,* 682 (5th ed.1979)).

The Pennsylvania Supreme Court expounded upon the definition in the case of *Noll v. Harrisburg Area YMCA,* 537 Pa. 274, 643 A.2d 81 (1994):

> An improvement includes everything that permanently enhances the value of real property. See 41 Am.Jur.2d *Improvements* § 1 (citing *Kentucky Farm & Cattle Co. v. Williams,* 140 F.Supp. 449 (E.D.Ky.1956); *Drennen & Co. v. Mercantile Trust & D. Co.,* 115 Ala. 592,

23 So. 164 (1897); *Watson Bros. Realty Co. v. Douglas County,* 149 Neb. 799, 32 N.W.2d 763 (1948); *Williamson v. Jones,* 43 W.Va. 562, 27 S.E. 411 (1897)). Commonly, improvements include: erection of a building; replacing old buildings with new ones; substantial repairs to a building necessary to preserve a building; the making of substantial additions to or changes in existing buildings; construction of sidewalks; erection of fences; and the preparation of land for building sites. See 41 Am.Jur.2d *Improvements* § 1.

It appears that for the purposes of § 5536 the most problematic area is where chattel or personalty is attached to real property. *See, e.g., Radvan v. General Elec. Co.,* 394 Pa.Super. 501, 576 A.2d 396 (1990), *appeal denied,* 527 Pa. 602, 589 A.2d 692 (1991) (welding machine attached to factory); *Schmoyer,* 423 Pa.Super. at 593, 621 A.2d at 692 (Spin Around ride attached to a playground); *Catanzaro,* 339 Pa.Super. at 481, 489 A.2d at 262 (skydome attached to a school). This is the situation in the instant case and requires us to delve into the law of fixtures. A fixture is by definition an improvement to real property. *Catanzaro,* 339 Pa.Super. at 487, 489 A.2d at 262; *Keeler v. Com. Dept. of Transp.,* 56 Pa.Cmwlth. 236, 239, 424 A.2d 614, 616 (1981). *See also* 41 Am. Jur.2d *Improvements* § 1. The general test used in determining when an article of personalty is a fixture has three components: (1) the relative permanence of attachment to realty; (2) the extent to which the chattel is necessary or essential to the use of the realty; and (3) the intention of the parties to make a permanent addition to the realty. *See Gore v. Bethlehem Area Sch. Dist.,* 113 Pa. Cmwlth. 394, 537 A.2d 913 (1988), *appeal*

*denied,* 519 Pa. 656, 546 A.2d 60 (1988); *See also* 35 Am.Jur.2d *Fixtures* § 4. *Id.* at 87.

When applying the three-part test set forth in *Noll,* "we look to the objective intent of the parties to permanently incorporate a chattel into real property as evidenced by the proven facts and surrounding circumstances entered into evidence." *Noll* at 88.

It is clear from the application of the *Noll* test that the refrigeration equipment, sinks and air curtains are indeed fixtures. The refrigeration equipment, sinks and air curtains were permanently attached to the Building and were necessary for the intended use of the Building. Devos conducted environmental and load studies to design the refrigeration equipment especially for the Building with the intent that it be a permanent addition.

■ The APA is ambiguous. The parties contemplate the sale of fixtures but not the sale of improvements. Under Pennsylvania law, "a fixture is by definition an improvement." *Noll* at 87. They are one and the same and accordingly, we are unable to determine from the language utilized in the APA what the parties intended to include in the sale and what was not intended for inclusion.

■ "The primary objective of a court when interpreting a contract is to ascertain the intent of the parties." *Seven Springs Farm, Inc. v. Croker,* 569 Pa. 202, 801 A.2d 1212, 1215 (2002).

> Those clear waters become murkier when an issue is raised as to lack of clarity or a claimed ambiguity in the contractual language-in that event the court "should hear the evidence presented by both parties and then decide whether 'there is objective indicia that, from the linguistic reference point of the parties, the terms of the contract are

susceptible of different meanings' " *Z & L Lumber,* 348 Pa.Super. at 586, 502 A.2d at 700, quoting *Mellon Bank,* 619 F.2d at 1011.

*Compass Technology, Inc. v. Tseng Laboratories, Inc.,* 71 F.3d 1125, 1131–32 (3d Cir.1995).

■ Where the words used in a contract are ambiguous, the surrounding circumstances may be examined to ascertain the intent of the parties. *Walton v. Philadelphia National Bank,* 376 Pa.Super. 329, 545 A.2d 1383, 1389 (1988).

Negotiations for this sale took place over a period of months. Vince and Jersey negotiated for Devos until Vince's death. Subsequently, Jersey and Attorney Lutz negotiated for Devos.

Steve and Louis no doubt worked hard in the daily operation of the Devos enterprise. Their involvement in the management of the operation was limited. Following the death of their father, they relied on others to negotiate the sale. They took no part in the sale negotiations. Their involvement was limited to discussions over employment contracts with the Buyer.

Steve and Louis did not see or review the APA prior to its signing. They had assisted in the preparation of a list of equipment and supplies attached to the APA. The list was detailed, but incomplete. It did not include everything that was being sold.

At the meeting where all of the documents were signed, Steve and Louis asked if the list represented everything that was being sold. An unknown person or persons indicated yes. We don't know who it was. It may have been the attorney representing Devos upon whom they heavily relied. Steve and Louis did not review the documentation in detail and relied on and

accepted the recommendations of their attorney.

In their minds, Steve and Louis knew that the Building was not being sold. A significant mortgage remained against the Building and they, along with their mother, had pledged their personal residences and additional collateral to secure the mortgage. The Building was being leased to New Diamond for two years and at the end of two years, if New Diamond didn't purchase the Building or extend the Lease, the Building would have to be sold to pay off the mortgage to protect their personal residences. They did not know the difference between personalty, fixtures and improvements, but assumed that the refrigeration equipment, sinks and air curtains were part of the Building and not being sold. However, that is not what was negotiated on their behalf by Jersey and Attorney Lutz. Inexplicably, Devos did not call Jersey or Attorney Lutz, those intimately involved in the negotiations leading up to the APA, to provide evidence as to their recollection of the negotiations.

Reese and Attorney Barson negotiated on behalf of the Buyer. Reese and Barson testified that the inclusion of the refrigeration equipment in the sale was discussed and agreed to at several meetings over the course of the negotiations. The actions taken by the parties are consistent with this result. The refrigeration equipment and the freezer equipment was subject to a security interest by Dollar Bank. Reese and Barson further testified that Dollar Bank objected to the sale of the separate freezer equipment because the freezer was a unique asset that involved structural changes to the Building that Dollar Bank wanted to maintain.

Reese and Barson's version of the facts is corroborated by the action taken by the parties and by Dollar Bank. Certain actions had to be taken to be accomplished after the APA and other documents were signed in preparation for the closing. Devos had to obtain a release of the security interests held by the banks in the items being sold. A meeting was held with Attorney Barson, Attorney Lutz, and Mr. Wheeler of Dollar Bank. Reese and Jersey may have attended. The purpose of the meeting was to obtain Dollar Bank's agreement to release its collateral. Dollar Bank objected to the release of the compressor/condenser and blower/evaporator units used for the freezer. Dollar Bank felt that the freezer was a unique asset and it involved structural changes to the Building. Dollar Bank wanted to keep the freezer in place. Dollar Bank felt differently about the refrigeration equipment which it agreed to release. Dollar Bank executed a UCC Form 3 to release certain of its collateral including "all refrigeration pumps and compressors other than those pumps and compressors related to or connected with the freezer."

We also note that it is not unusual to remove refrigeration equipment from a facility. Borden, the prior owner of the Building, removed all of its refrigeration equipment when it vacated the facility and when Devos moved into the Building, it brought with it some of the refrigeration equipment that it had installed in its prior location.

■ The intent of the Buyer and the Seller was to include the refrigeration equipment in the sale. We find that Devos sold the refrigeration equipment to New Diamond. We further find that New Diamond did not abandon the refrigeration equipment when it moved from the Building. It continued to pay rent through June, 1999, and made repeated efforts to obtain consent from Devos to remove the balance of the refrigeration equipment. After the bankruptcy filing, the Building was sold over the objection of Parkway

pursuant to Court Order. An amount was held in escrow pending resolution of this dispute.

Parkway, which now owns the equipment, having received it from New Diamond on account of its security interest, is entitled to recover the fair market value of the refrigeration equipment.

### Value of Parkway's Refrigeration Equipment

■ The evidence of value is sparse. In response to the Debtor's Motion for approval of the sale of the Building, Parkway asserted that the value of the refrigeration equipment remaining the Building was $6,000–$10,000, depending on condition. Parkway subsequently alleged that those amounts were for scrap value and did not represent fair market value. Parkway filed a proof of claim in the amount of $90,300 on account of Debtor's unlawful sale of Parkway's property.[7] Parkway received a quotation from American Wholesale, allegedly to purchase the remaining equipment for $67,300. A review of the document indicates that it was a quote from American Wholesale to sell equipment to Parkway. No one from American Wholesale testified.

There is support for a value greater than $6,000–$10,000 from the arguments of Debtor's counsel at the hearing on the sale of the Building. Debtor's counsel averred that, based on information that he had received, the equipment remaining in the Building had a conservative value of $50,000 and could bring as much as $100,000 if it were sold over a period of 12 to 18 months. Debtor was willing to include the equipment in the real estate sale if there was a $50,000 overbid on the real

estate and equipment. The Court agreed and the open bidding brought more than $50,000 over the original offer.

We conclude that the value of the remaining refrigeration equipment which was owned by Parkway and sold by Devos is $50,000.

### Sinks and Air Curtains

■ Unlike the refrigeration equipment, there is no evidence to suggest that the sinks and air curtains were specifically negotiated for and included in the sale. These are fixtures that were incorporated in and were improvements to the Building and remained property of Devos which Parkway removed. Parkway removed two sinks at a cost new of $300 each, and two air curtains at a cost new of $1,000 each. There is no testimony as to the value of these items in used condition, but the fair market value of these used fixtures would be significantly less than the cost new. We find that Devos is entitled to $1,300 for these fixtures.

### Racking

■ Devos asserts that Parkway wrongfully removed certain racking on which Allegheny Valley Bank had a security interest. Parkway avers that it did not remove the racking. There is no evidence to show what happened to the racking in question. Devos has no claim against Parkway for the racking.

### Computer Software

■ Devos asserts a claim for $60,000 for software which it alleges was removed from a computer left at the Building. Under the terms of the APA, Parkway pur-

7. Included in Parkway's proof of claim are $67,300 for refrigeration equipment, $3,000 for a safe and conference table, chairs and credenza, and $20,000 for racking, for a total of $90,300. There is no evidence that Devos disposed of, took, or sold a safe, conference table, chairs, credenza or any racking belonging to Parkway.

chased the software. Further, there was a lack of evidence as to its removal. Devos has no claim against Parkway for the software.

### Reduced Value of the Facility

■ Parkway appropriately removed the refrigeration equipment from the Building. Any additional items taken (sinks and air curtains) were de minimus and would have had no effect on the value of the Building. Devos is entitled to no recovery for the reduction in the value of the Building.

### Accounts Receivable

■ Fleet Bank ("Fleet") had a security interest in Devos's accounts receivable. Fleet was owed $1,675,000 at the time of the sale to New Diamond. Under the terms of the APA, New Diamond was to collect the Devos receivables and remit the proceeds to Fleet. At the time of the sale, Louis testified that Devos's receivables amount to "roughly 2.3 million."

New Diamond, and later Parkway, collected the receivables and remitted the proceeds to Fleet. Following said collections, Fleet had a remaining balance due of $165,000. The Devos family paid the balance from Vince's estate. Steve and Louis state that they never asked for nor ever received any accounting of the collections by New Diamond and/or Parkway. We do not find it believable that the Devos family would remit a balance of $165,000 to satisfy Fleet without questioning the collection of the receivables or asking for an accounting if there was any belief that the accounts receivable should have been sufficient to satisfy Fleet in full, or that New Diamond and/or Parkway did not properly remit the receivables collected to Fleet.

Accordingly, we cannot find that Parkway has any liability to Devos in regard to the accounts receivable.

### Lease

■ Parkway "took over" New Diamond in mid–1998. Its equipment remained in the Building. It continued to occupy the Building and pay rent. Parkway failed to pay the last three rental payments due on July 1, August 1, and August 31, 1998 in the total amount of $75,866. The settlement sheet on the sale of the Building reflects that Parkway also failed to pay its share of two-thirds of the real estate taxes for 1999 in the amount claimed by Devos of $36,638.

Devos asserts that Parkway also failed to pay utilities used at the Building as required by the Lease. In substantiation of the bulk of its claim for utilities, Devos directs our attention to a $22,000 proof of claim filed by the electric company. There is no information provided as to the dates service was incurred. The claim was filed on March 10, 2000, long after the end of the Lease term. Further, there is no evidence that Devos was required to make payment for any utilities used by Parkway during the lease term.

Parkway asserts that it did not pay the remaining amount due under the Lease because it is entitled to an offset for amounts that were paid on obligations owed by Devos when New Diamond took over the operation. New Diamond elected to make payment for certain hospitalization insurance premiums that covered Devos's employees because it wanted to maintain the employees, and the employees had incurred some claims that would not be paid unless the coverage was continued. Section 10.0 of the APA provides that New Diamond had no obligation to assume any liabilities, obligations or responsibilities related to Devos employees. New Diamond also paid outstanding electric bills rather than incur the payment of a security de-

posit to obtain new service. Similarly, it paid outstanding telephone bills to maintain the same number. New Diamond/Parkway was under no obligation to make these payments and was not required to do so by the terms of the APA. It voluntarily elected to pay these amounts as such payments served its business purposes and is not entitled to a setoff against the amounts due under the Lease.

Parkway is obligated to Devos for the amount of $112,504 ($75,866 rent + 36,638 taxes) due under the Lease.

### Attorney Fees

Devos directs our attention to the indemnification provisions of Section 11.02 of the APA and Article 4 and Section 15(a) of the Lease in support of its claim for attorney's fees.

In Section 11.02, the Buyer agrees to indemnify and hold Seller harmless from any losses resulting from any breach of the APA by the Purchaser. In Section 11.01, Seller provides indemnification to the Buyer, specifically including attorney's fees.

Article 4 of the Lease provides that Lessee will pay any "costs and expenses (including legal fees) which Lessor may suffer or incur by reason of any default of Lessee." Article 15 similarly provides that Lessee shall indemnify Lessor from any expenses arising out of Lessee's failure to comply with all provisions of the Lease.

Both sides have liability for attorney's fees under the respective documents. Under the APA, Devos is liable for breach of the APA for withholding and selling equipment which we find belongs to the Buyer, and under the Lease, the Lessee is liable for Devos's attorney's fees for failure to pay amounts due under the Lease.

The cause of this lawsuit is the fundamental ambiguity of the sale document. Each party was, at least partially, justified in taking the position it took. It would be inappropriate to charge either party with the counsel fees of the other.

We resolve the attorney fee issue by disallowing the claims for fees in their entirety. Each party is responsible for payment of its own attorney's fees.

### Pre–Judgment Interest

Pre-judgment interest is appropriate in contractual cases where there is a failure to pay a fixed or liquidated sum due on a certain date. *Francisco v. U.S.*, 267 F.3d 303, 308 (3d Cir.2001); *Pollice v. National Tax Funding L.P.*, 225 F.3d 379 (3d Cir.2000).

Here, the net obligation was sufficiently indefinite that the amount was incapable of calculation by the parties and thus not fixed or liquidated. Having determined that neither party is without fault under the agreements between them, we conclude that pre-judgment interest is not warranted.

### Conclusion

Devos is liable to Parkway in the amount of $50,000 for the fair market value of its refrigeration equipment left in the Building. Parkway owes Devos $1,300 for sinks and air curtains wrongfully removed from the Building and $112,504 for rent and taxes due under the Lease.

The final result is a recommendation that the District Court enter a net judgment in favor of Devos and against New Diamond and Parkway, jointly and severally, in the amount of $63,804 ($112,504 + 1,300 − 50,000). Devos's Complaint should be dismissed as to Reese. The $50,000 held in escrow should be paid to the bankruptcy estate of Devos, Inc.

## RECOMMENDATION TO DISTRICT COURT

This 27 day of May, 2004, in accordance with the accompanying Recommendation, it shall be, and hereby is, recommended that the United States District Court for the Western District of Pennsylvania enter an Order awarding a net judgment in the amount of $63,804 in favor of Devos, Inc. and against Parkway Provision Company and Diamond Meat and Food Service Company, Inc., jointly and severally.

The $50,000 held in escrow, and any accumulated interest thereon, shall be paid to the bankruptcy estate of Devos, Inc.

It is further recommended that Devos's Complaint at Adversary No. 00–2664 be dismissed as to Defendant, David L. Reese.

### PROPOSED JUDGMENT ORDER

This _____ day of _____, 2004, after consideration of the proposed findings of fact and conclusions of law submitted by the Bankruptcy Court and after de novo review of those matters to which any party has timely and specifically objected, it shall be, and hereby is, ORDERED that a net judgment on both of the within Complaints and the Counterclaims thereto, in the amount of $63,804 is entered in favor of Devos, Inc. and against Parkway Provision Company and Diamond Meat and Food Service Company, Inc., jointly and severally. It is

FURTHER ORDERED that the $50,000 held in escrow, and any accumulated interest thereon, shall be paid to the bankruptcy estate of Devos, Inc. It is

FURTHER ORDERED that the Complaint filed by Devos, Inc. is dismissed as to Defendant, David L. Reese.